ALSMEIER ET AL. *v.* ADAMS ET AL.

[No. 8,661. Filed July 1, 1914. Rehearing denied June 3, 1915. Transfer denied June 2, 1916.)

1. MUNICIPAL CORPORATIONS.—*Public Improvements.—Acceptance. —Effect.*—The acceptance of a public improvement and approval of the assessments by a board of public works is a *quasi* judicial act, and is conclusive against property owners unless fraudulent. pp. 232, 250.

2. PLEADING.—*Complaint.—Collateral Attack.—What Constitutes.*— Where the plaintiffs in an action sought to annul the acceptance of a public work by the board of public works and to have the assessment roll therefor declared void, and prayed an injunction restraining the collection of assessments on account of such public work, the attack on such acceptance and assessment roll is direct and not collateral, as the injunctive relief asked for is only incidental or additional to the principal purpose of the action. p. 232.

3. MUNICIPAL CORPORATIONS.—*Public Improvements.—Assessments. —Actions to Declare Invalid.—Sufficiency of Complaint.*—Where, in an action to have the acceptance of a public sewer annulled and to have the assessment roll declared void, the complaint, while not charging fraud in specific terms, averred a radical and inexcusable departure from the kind of sewer specified in the contract; that the construction work was defective, and that there was a substantial saving to the contractor by means of such departure and an arbitrary acceptance of the work with full knowledge of all the facts and for the express purpose of relieving the contractor, such facts

are sufficient to charge constructive fraud and the complaint states a good cause of action, as fraud or fraudulent intent need be averred as a fact only in actions to which the statute of frauds, §7483 Burns 1914, §4924 R. S. 1881, is applicable.    p. 233.

4.  MUNICIPAL CORPORATIONS.—*Public Improvements.—Acceptance of Work.—Effect.—*Where the board of public works is authorized by statute to determine whether a public work has been completed according to contract, an acceptance of such work, in the absence of fraud, is conclusive on all persons affected that the work has been so completed.    p. 237.

5.  MUNICIPAL CORPORATIONS.—*Public Improvements.—Acceptance.—* While the law requires only a substantial compliance with the terms of a contract, a board of public works is without authority to bind the property owners by the acceptance of a public work which departs radically from the contract specifications.    p. 238.

6.  MUNICIPAL CORPORATIONS.—*Public Improvements.—Compliance with Contract.—What Constitutes.—Acceptance.—Constructive Fraud.* —Whether there has been a substantial compliance with the terms of a contract for a public work or a radical departure therefrom depends upon the exigencies of the occasion and the surrounding circumstances.   Where a completed public work departs from the contract specifications, in determining whether the departure has been so radical as to make the acceptance of the work constructively fraudulent, the fact as to the general utility of the improvement for the purposes intended and whether affected property owners have suffered pecuniary injury are important considerations.    p. 238.

7.  MUNICIPAL CORPORATIONS.—*Public Improvements.—Authority of Board of Public Works.—*In the building of a sewer, where unforeseen difficulties arise rendering the completion of the work according to the contract specifications impracticable, the board of public works is authorized to permit a completion of the work in a manner substantially the same as called for by the contract, and the board, in consenting under such circumstances, to a substitution of reinforced concrete pipe sewer for one of monolithic concrete construction, where the former was of the same diameter and general utility as the latter, acted within its authority.  p. 239.

8.  MUNICIPAL CORPORATIONS.—*Public Improvements.—Changes in Work.—Consent of Board of Public Works.—*A contract for the construction of a sewer providing that if, because of unforeseen circumstances, it should become necessary to substantially change the specified process of construction the written order of the board of public works must first be obtained; and, because of an unforeseen contingency, a change was made in the method of construction without such written order from the board but with the consent of the city engineer the failure to obtain the written order, while an irregularity, did not invalidate the proceedings.   p. 245.

9.  MUNICIPAL CORPORATIONS.—*Public Works.—Power of Board of Public Works.—*Where the board of public works of a city was

vested with the power to consent to such changes in the specified method of construction of a sewer as was rendered necessary by reason of unforeseen contingencies, it had the power to ratify a change made by the contractor, although its written consent to the change was not first obtained as required by the contract, and an acceptance of such work with knowledge was a ratification. p. 245.

10. FRAUD.—*Actions.—Right of Action.*—The mere fact of fraudulent or wrongful conduct in a completed act gives no right of action unless such conduct results in injury to the complaining party. p. 252.

11. FRAUD.—*Constructive Fraud.—What Constitutes.*—Where the conduct of a party results in grave injury, his acts, however innocent, may be constructively fraudulent. p. 252.

12. MUNICIPAL CORPORATIONS.—*Public Improvements.—Fraud.*— An inference of fraud can not be deduced from the mere fact that a completed public work does not comply strictly with the specifications, as a substantial compliance is all that the law requires. p. 252.

13. MUNICIPAL CORPORATIONS.—*Public Improvements.—Acceptance.—Board of Public Works.—Powers.*—A contractor engaged in a public work satisfies the law by a substantial compliance with the contract, and, in determining whether there has been such a substantial compliance as to repel the inference of fraud, the board of public works has the right to exercise a certain discretion in accepting the completed work, which acceptance is binding upon the property owners unless the work as accepted differs entirely from the contract specifications or is utterly worthless. p. 252.

14. MUNICIPAL CORPORATIONS.—*Public Improvements.—Defects.— Acceptance.*—A contract for the construction of a sewer provided that it be of monolithic concrete, at least eight inches thick, and stipulated the amount of infiltration permissible. When a part of the sewer had been completed it was found impracticable, because of unforeseen obstacles, to complete the work according to the contract specifications, and the remainder of the sewer was constructed of reinforced concrete pipes of the proper diameter, but which were made of poor material and were so imperfectly joined together that approximately five times as much surface water seeped into the sewer as was permitted by the specifications; also, some of the pipes used were cracked and broken. *Held*, that the completed sewer did not substantially comply with the terms of the contract and that its acceptance by the board of public works should be set aside as constructively fraudulent. p. 253.

15. APPEAL.—*Jurisdiction over Parties.—Cross-Errors.—Appearance.*—In a suit commenced by a number of property owners to enjoin the collection of assessments on account of the construction of a sewer, a judgment was rendered in favor of part of the plaintiffs and against some of them on the ground that by their acts they were estopped from complaining against the collection of such assessments. The latter appealed and the other plaintiffs filed a confession of error. The contractor, one of the appellees, as-

signed cross-errors challenging the correctness of the conclusions of law of the trial court upon which is based the judgment in favor of the appellee plaintiffs, but no notice of such assignment was served on appellees. The reply brief of appellants attacked not only such cross-assignment of errors as affected them, but also argued against those cross-errors attacking the conclusions of law which affected the appellee plaintiffs alone. The appellate court reversed the judgment and remanded the case, with direction as to costs which affected appellees, and thereupon they filed a petition for rehearing setting up that the appellate court had no jurisdiction over them in reference to the cross-errors. *Held,* that as the argument of the reply brief to cross-appellants' assignments of cross-errors was both for the purpose of sustaining the conclusions of law favorable to appellee plaintiffs as well as to attack such conclusions of law as were adverse to appellants, such brief constituted an appearance for appellee plaintiffs and gave the appellate tribunal jurisdiction to enter the mandate it did. p. 259.

16. ATTORNEY AND CLIENT.—*Authority of Attorney.—Presumption.*—A member of the firm of attorneys which represented all party plaintiffs below, and who filed the confession of error on behalf of appellee plaintiffs, made an affidavit in support of the petition for rehearing and the motion to modify the appellate court's mandate, in which affidavit he set up that his firm took no part in the prosecution of the appeal after the filing of such confession of errors, but did not state that the attorneys who filed the reply brief in behalf of appellees did not have authority to do so. *Held,* that in the absence of such a showing the attorneys will be presumed to have had the requisite authority to file the brief for appellees. p. 261.

From the Marion Superior Court (79366); *Edward W. Little,* Judge *pro tem.*

Action by Fielding A. Conway and others against the Indianapolis Board of Public Works and others, to set aside an assessment roll and to enjoin the collection of assessments on account of the construction of a sewer. Judgment was rendered in favor of Margaret E. Adams and others, and against Lizzetta Alsmeier and others, and Lizzetta Alsmeier and others appeal. *Reversed.*

*Louis B. Ewbank, John W. Hanan* and *J. Frank Hanan,* for appellants.

*Leo M. Rappaport, Albrecht R. C. Kipp, Smith, Hornbrook & Smith* and *Richard L. Ewbank,* for appellees.

CALDWELL, J.—Fielding A. Conway and others filed their complaint in the court below in behalf of themselves and a large number of other land and lot owners, who with said Conway and others are designated in this opinion as plaintiffs, asking as relief that the acceptance of the Pleasant Run interceptor sewer by the board of public works of the city of Indianapolis, and the primary assessment roll adopted thereon be set aside as fraudulent and void, and that certain defendants be enjoined from collecting any assessments on account of the construction of said sewer, and from taking any further steps in the matter of said improvement.

Stated generally, the basis of grievance, as set out in the complaint, is to the effect that, while the specifications required that a large portion of said sewer be constructed of monolithic concrete eight inches in thickness, most of such portion, as actually constructed, consists of reinforced concrete pipes in sections of three feet in length and about three and one-half inches thick; and that said sewer was defectively constructed, and that material of poor grade was used.

The board of public works of said city, the treasurer of Marion county, as *ex officio* treasurer of said city, the city comptroller and Morris M. Defrees, as contractor, were made defendants. Said Defrees having assigned his interest in said assessment roll to August M. Kuhn, and having thereafter died, his administrator, Hugh J. Defrees, and said assignee are made appellees in this court.

Morris M. Defrees' demurrer to the complaint for insufficiency of facts was overruled, and exception reserved. Each defendant filed a general denial. Said defendant contractor filed also a special answer in three paragraphs, Nos. 2, 3 and

4. The theory of the second paragraph of answer is that said change in the method of construction was made by authority and direction of the city officers, on account of an alleged impossibility to use the continuous monolithic form of construction, because of large quantities of water in the trenches; the third, that the lot owners were estopped by reason of an alleged acquiescence in the change of method of construction, they having knowledge of the facts; and the fourth, that the work had been inspected and accepted by the city, and made a part of the city's sanitary sewer system, and could not be changed. On a trial by the court, judgment was rendered in favor of appellee Margaret E. Adams and 170 other appellees, who were plaintiffs below, perpetually enjoining defendants from in any manner attempting to enforce assessments against the respective properties of said appellees based on said work. Judgment was rendered against appellant Lizzetta Alsmeier and sixty other appellants, who were plaintiffs below.

The court, at the request of the parties, found the facts specially, and stated conclusions of law thereon. Except as stated in other connections, the material part of the finding of facts is in substance as follows: On June 22, 1906, the board of public works of the city of Indianapolis adopted a resolution under the provisions of the act of 1905 for the construction of the Pleasant Run interceptor sewer, to begin on the east bank of White river at a designated point, and thence in a northeasterly direction, approximately a distance of 20,665 feet to the center of Keystone avenue.

The specifications provided that said sewer from White river to a point within 3,580 feet of its Keystone avenue terminus should be constructed circular in form, and should consist of either monolithic construction eight inches in thickness or of brick laid in two courses, and that the remaining part of said sewer should consist of vitrified tile sectional pipes, double strength, twenty-four inches in diameter. The engineer's estimate of the cost of said sewer was $130,000. On May 13, 1907, said board of public works, pursuant to notice duly given and bids received, entered into a contract in writing with said Morris M. Defrees for the construction of said sewer, according to the plans, specifications, etc., at the price of $5.835 per lineal foot. The profile showed the presence of water along the line of a part of said sewer at a depth of from six to eight feet, but did not show the quantity or velocity of movement of such water. Said sewer throughout practically its entire length was constructed at a depth of from five to ten feet below said water level. Through a large part of its course, said sewer followed the north bank of Pleasant Run, and within an average distance of 100 feet from that stream. The earth formation along the line of said sewer and adjacent to said stream consists of clay near the surface and of gravel and sand at greater depth, which sand and gravel was found to be impregnated with a large quantity of water flowing towards said stream. The quantity and velocity of such water could not be and was not definitely ascertained by said contractor or the city engineer, until in the process of actual construction. Defrees commenced said work at the White river terminus in June, 1907, and after constructing a few hundred feet of it,

sublet the contract to John J. Jenkins. Defrees and Jenkins continued said work until 4,210 feet of monolithic concrete construction eight inches thick had been completed. Said sewer was constructed in a trench, averaging in depth about nineteen feet, sheeted with wooden sheeting. In monolithic construction, the lower half of the sewer is called the invert and the upper half the arch. The process of monolithic construction, which process was followed in this case, is as follows: The bottom of the trench is excavated concave in form, and the concrete mixture is poured into the bottom the requisite thickness, whereupon a metal mold is placed upon such concrete in such a manner as to permit the formation of the entire invert. The concrete is then packed around such mold the required thickness. After the invert has become thoroughly dry and hard, the mold is inverted and placed to form the inner surface of the arch, and concrete packed around and allowed to harden as aforesaid. The monolithic work here was constructed in sections varying from ten to fifty feet in length. When said 4,210 feet of sewer had been constructed, Defrees and Jenkins met with difficulty in the amount of water encountered in the trench, which water seeped through the sheeting and into the trench in such quantities as to wash the cement out of the concrete and thereby reduced it to a condition in which it would not harden, whereby the strength of such concrete was materially lessened. Defrees and Jenkins employed various methods to carry off the water and prevent it from coming in contact with said concrete, but were unable by the means used to prevent such water from coming in contact with the arch, which continued to crumble and cave in, whereupon said contractors obtained the consent

of the engineer to substitute said reinforced concrete for the monolithic construction. Having obtained such consent, Defrees and Jenkins contracted for the manufacture of such reinforced concrete pipe to be used in completing the concrete portion of said work, the same to be manufactured along the line of the sewer at $1.50 per running foot for pipes thirty inches in diameter, and $1.15 per running foot for pipes having a diameter of twenty-seven inches, being the diameters required by the specifications, of which contract and the terms thereof the engineer and his assistant had full knowledge. Said contract provided that such pipes should be composed of a mixture of three parts sand and gravel and one part of cement, manufactured in molds above the ground, each pipe to be three feet long, with walls three and one-half inches thick, reinforced by steel bands running longitudinally and in circular form through such concrete, one end to be a flange or bell. Except as otherwise indicated in this opinion, the pipes were manufactured as specified in the contract. The process of construction by using such pipes, which process was followed here, is as follows: Two pipes are placed in the trench, so that the uniform end of one is inserted into the bell end of the other, and the two are bound and fastened together with hooks and bands of steel. A close-fitting steel band is then placed around the joint on the inside, and a like band with a slot in the top around the outside, and cement of a consistency to run freely is poured into the slot until the joint is filled. When the cement in the joint has become thoroughly dry and hard, the inner and outer bands are removed. On September 24, 1909, the engineer filed with said board his report to the effect that the contract for said improvement had been com-

pleted, which report showed the length of said sewer to be 20,612 feet, and that the contract price at $5.835 per lineal foot amounted to $120,271.02, and that, making certain additions for extra work and deductions for material not furnished, the net contract price was $119,370.77, being the amount of the assessment roll. Thereafter, on said day, the board adopted the primary assessment roll on said improvement, by which roll all the properties within the ascertained district were assessed, including real estate of each party plaintiff to this action, and for whom this action was brought. Thereafter, pursuant to notice, and after several continuances, the board on November 3, 1909, heard the complaints of such property owners as appeared for that purpose. A large number of the property owners attended, some of whom remonstrated against the acceptance of said sewer, and others of whom urged its acceptance. The board thereupon approved the assessment roll without change, and caused the same to be entered on the proper books of the treasurer of said city, and such assessments as therein entered, and as have not been paid constitute liens on the respective properties of the parties plaintiff to this action, and for whom this action is brought, which properties are specifically described, and which respective amounts of said liens are specifically found by the court. The board in adopting said primary assessment roll, and in approving the same as a final assessment roll made no independent investigation as to whether said contract was completed or as to what benefits were received, but it acted upon the judgment and report of the assessment bureau of said city and of the engineer. The court found that the cost of construction of the sewer from end to end was approximately $120,000. In the latter

part of December, 1908, after a large part of the reinforced concrete construction had been completed, said Conway and others, acting in their own behalf, and as representing property owners whose property was liable for assessment for the construction of the sewer, first learned that the contract required monolithic construction, and thereupon they protested to the board as to the character of the material being used in said reinforced concrete pipes. On February 15, 1909, 256 property owners, including plaintiffs, having learned that the contract provided for monolithic construction and that reinforced concrete was being substituted, filed with the board a remonstrance based on the assigned reason generally stated that said sewer was not being constructed according to specifications, and that as being built it would be worthless. On May 15, 1909, 286 property owners, including plaintiffs, filed with the board a remonstrance similar to the previous one, and delivered a copy thereof to the engineer, contractor and subcontractor, stating also therein that in view of the method of construction being used they would protest against the acceptance of the sewer.

This suit was instituted October 2, 1909, by and in behalf of plaintiffs, all of whom the court finds had learned by rumor or otherwise, at or prior to the time of signing said remonstrances, that the sewer was not being constructed according to contract. The court then sets out the names of said persons, the description of their said real estate and respective amounts of their assessments, and the length of time prior to the signing of the remonstrance that they knew by rumor or otherwise that said sewer was being constructed of reinforced concrete pipes rather than of monolithic concrete.

On said finding of facts, the court stated ten conclusions of law, the first, ninth and tenth of which are in substance as follows: (1) That the action of said board in adopting said primary assessment roll, and all subsequent acts thereon were null and void as to all persons who made seasonable objection to the construction of such sewer, under such change of plan, for the reason that the sewer constructed was so radically different from that specified that said board had no power to accept it. (9) In the ninth conclusion the court sets out the names of said 171 persons and states that they are entitled to a perpetual injunction against the collection of the assessments returned by the primary and permanent rolls. (10) In the tenth conclusion the court states that the 61 appellants are estopped from contesting the validity of the assessment rolls, for the reason that they had either connected their properties with said sewer or had neglected seasonably to protest, with knowledge of the facts. As the other conclusions must stand or fall with the first, ninth and tenth, it is not necessary to set them out.

The decree follows the conclusions of law. Each appellant excepted to conclusion No. 10, and has properly assigned error on the same. Said 171 property owners, in whose favor judgment was rendered, and also said board of public works and the officers of said city, who were defendants below, have appeared to this appeal, and as appellees have filed a confession of error, to the effect that the court · erred in the conclusion No. 10 stated on the findings. Said Hugh J. Defrees as such administrator, and said August M. Kuhn, as such assignee, have each assigned cross-errors, challenging the court's ruling on the demurrer to the complaint, and challenging also the first,

second, seventh and ninth conclusions of law respectively.

We first determine the sufficiency of the complaint, which question we hold to be properly presented. Its allegations are in part to the effect that the contractor, after having completed about 4,000 feet of the sewer according to the specifications, used, in constructing the balance of the concrete portion of it, reinforced concrete pipes three and one-half inches thick, instead of following the prescribed plan of continuous monolithic concrete work eight inches thick; that no person in authority consented to such change, and that the engineer in charge, on being solicited by the contractor, refused to consent to such change; that the contractor departed from the specified plan of work, as alleged, over the protest of the property owners, who were plaintiffs below; that the sand and gravel used in building said pipes contained soil and other foreign substances; and that, in constructing such sewer, the contractor used cracked and broken pipes, and did not properly cement the joints, and that as a consequence, large quantities of water passed into the sewer from the surrounding earth, and that the noxious substances designed to be carried by the sewer would escape therefrom if it should be used. Facts are alleged to the effect that the city engineer repeatedly assured plaintiffs that the sewer would not be recommended for acceptance, and that plaintiffs, as property owners affected, relied on such assurance, and as a consequence were deceived into a failure to be present and protest when such sewer was recommended for acceptance and actually accepted by the board; that the sewer as constructed by the use of such pipe, cost $10,000 less than would have been its cost if constructed accord-

ing to the specifications, and that the board with full knowledge of the facts alleged, arbitrarily accepted said sewer as a substitute for the one specified, in order to save the contractor and his sureties and assigns from loss. The prayer was that the acceptance of said sewer and the primary assessment roll adopted thereon be set aside as fraudulent and void and of no force or effect, and that defendants be enjoined from taking any steps looking to the collection of assessments based on such acceptance and on said assessment roll.

The argument advanced against the sufficiency of the complaint may be stated in outline as follows: That the board of public works was clothed with authority to determine whether such work had been completed according to the contract; that in so determining it acted in a *quasi* judicial capacity; that the acceptance and assessments resulting from such determination partake of the nature of judgments, and like judgments they are not open to collateral attack; that on the contrary, they are binding on the property owners, unless adjudged fradulent in a direct proceeding, expressly directed to such end, and that this proceeding is collateral and no fraud is charged. The argument is sound to the extent that the acceptance of the work and approval of the assessments was a

1. *quasi* judicial act, conclusive against the property owners unless fradulent. *Town, etc.* v. *Gorman* (1912), 179 Ind. 1, 100 N. E. 296; *Gorman* v. *Johnson* (1910), 46 Ind. App. 672, 91 N. E. 971; *Shank* v. *Smith* (1901), 157 Ind. 401, 412, 61 N. E. 932, 55 L. R. A. 564; *Darnell* v. *Keller* (1897), 18 Ind. App. 103, 45 N. E. 676. As determined from the averments and prayer of the complaint,

2. however, the proceeding is directed specifically to the end that said acceptance may be

annulled, and said assessment roll declared void. The attack is therefore direct rather than collateral. The mere fact that injunctive relief is asked as an incident or in addition to the principal relief sought does not change the nature of the attack. Should the other relief prayed for be granted, the equivalent of such injunctive relief would follow as a necessary consequence. A proceeding to collect the assessments could not be successfully maintained, if prior to the bringing of such an action, the acceptance of the work and the assessment roll adopted thereon had been set aside. *State* v. *Hindman* (1902), 159 Ind. 586, 65 N. E. 911; *Cotterell* v. *Koon* (1898), 151 Ind. 182, 51 N. E. 235; *Gorman* v. *Johnson, supra; Darnell* v. *Keller, supra; Kirby* v. *Kirby* (1895), 142 Ind. 419, 41 N. E. 809; *Asbury* v. *Frisz* (1897), 148 Ind. 513, 47 N. E. 328; *Frankel* v. *Garrard* (1902), 160 Ind. 209, 214, 66 N. E. 687.

While fraud in terms is not charged in the complaint, the facts averred show a radical and apparently inexcusable departure from the kind of sewer specified in the contract; materially defective work in the actual construction; a saving of $10,000 to the contractor, by reason of such departure; and an arbitrary acceptance of the work by the board with full knowledge of all the facts and for the express purpose of relieving the contractor. Such facts, with others pleaded, are sufficient 3. to constitute a charge of constructive fraud or fraud in law. It is only in proceedings to which §21 of our statute of frauds (being §7483 Burns 1914, §4924 R. S. 1881) is applicable that fraud or fraudulent intent must be directly averred as a fact. *Gorman* v. *Gorman* (1913), 54 Ind. App. 408, 103 N. E. 16; *Crawfordsville, etc., Co.* v. *Ramsey* (1913), 55 Ind. App. 40, 100 N. E. 1049; *Cotterell* v.

*Koon, supra; Gorman* v. *Johnson, supra; Eiermann* v. *Milwaukee* (1910), 142 Wis. 606, 126 N. W. 53, 27 L. R. A. (N. S.) 1085. The court did not err in overruling the demurrer to the complaint.

We proceed to consider the conclusions of law. Conclusion No. 1 is to the effect that the action of the board of public works in accepting said sewer was void because the sewer constructed was radically different from that specified. Said conclusion, as we construe it, is based on the fact that the plan of construction was changed, as indicated, rather than on the fact that the sewer was defective by reason of unskillful work and the use of faulty material. Briefly summed up, the facts from which the court drew said conclusion, in addition to those hereinbefore set out, are as follows: At the lower end, 4,210 feet of the sewer was constructed according to the specifications, whereupon water difficulties were encountered to the extent that the contractor was able to make progress for a period of more than twenty days at the rate of less than two and one-half feet per day. The contractor was chargeable with knowledge that he would probably have to contend with water, but the quantity and velocity of such water could not be and was not definitely ascertained by either him or the city engineer until a substantial part of said work had been done as aforesaid. Both the contractor and the subcontractor were reasonably experienced in sewer building, and they believed that it was impracticable and impossible to continue said monolithic process of construction, whereupon they called the city engineer and his assistant into conference and, after examining into the situation, it was determined by such conference that it was impracticable to continue such process of construction, under the special circumstances pre-

sented, and that if such process were continued
the sewer so constructed would not be serviceable.
As applicable to such a situation, the specifica-
tions provided that the board reserved the right
to make changes more important than those of
mere detail "should the exigency arise and become
apparent during the progress of the work  *   *   *
by reason of obstructions met with which could not
reasonably have been foreseen before the work
began, notwithstanding such changes or alterations
may materially increase or decrease the cost of the
work, but the contractor shall not proceed with
such change or alterations without a written order
from the board, the price agreed upon to be added
to or deducted from the contract price being stated
in the order." The contractor, however, instead
of appealing to said provision of the specifications,
continued said work a distance of 150 feet by the
use of said reinforced concrete pipe in place of said
monolithic construction, and then submitted said
work to the engineer, who examined and approved
the same, and gave his verbal consent to the com-
pletion of the concrete portion of said sewer by the
use of such pipe, whereupon the contractor pro-
ceeded with such process. The board first learned
of such change in the method of construction when
about 1,000 feet of such pipe had been manu-
factured and laid, but at no time either formally
consented or objected to such change. At some
time while such work was going on, the contractor
was informed by said board or some member of it
that the board had not consented to such change,
and that he was proceeding at his own risk. After
the board had knowledge of such change in the
method of construction, it frequently discussed the
matter with the engineer and mayor, and constantly
acquiesced therein. Thirteen thousand feet of said

sewer was built by the use of reinforced concrete pipe, 12,000 feet of which was constructed after said board had knowledge of said change in process of construction, and while it was acquiescing therein. The remaining 4,000 feet of the sewer was completed by the use of sewer tile as specified. The engineer having reported the sewer as completed, the board, with full knowledge of the use of said reinforced concrete pipe instead of said monolithic construction, and of the conditions that caused such change to be made, accepted the sewer as in full performance of the contract.

The real difficulty encountered in said process of monolithic construction seems to have been to prevent the water from coming in contact with the arch. On this point the court found from the evidence that it was not possible to overcome such difficulty by the use of any of the various means adopted, but that by recourse to methods not specified by the finding, it would have been practicable to have prevented the water from coming in contact with such arch, but that to have done so would have resulted in a large expense over and above the expense incurred in the process subsequently followed, and would have rendered the cost of construction in excess of the cost under such process. The contract price of said sewer as found by the court was $119,370.77, and the actual cost of construction was practically $120,000, or, assuming said sewer to be paid for at the contract price, it was constructed at a loss to the contractor of about $629.23. The court finds also that such reinforced concrete sewer, if built in a skillful and workmanlike manner, is as impervious to water and as strong as such monolithic construction. It is necessary that the power be lodged somewhere to determine whether a public work such as is

involved here has been completed according to the contract. Our statute clothes the board of public works with such authority, and when that 4. body has determined such question, and indicated its conclusion by an acceptance of the work, and an approval of the assessments therefor, such acceptance, in the absence of fraud, is conclusive on all persons affected that the work has been completed as required by the contract. *Town, etc.* v. *Gorman, supra; Dawson* v. *Hipskind* (1909), 173 Ind. 216, 89 N. E. 863; *Holloran* v. *Morman* (1901), 27 Ind. App. 309, 59 N. E. 869; *Darnell* v. *Keller, supra.*

Actual fraud is not found here as a fact. Unless a conclusion of fraud in law or constructive fraud springs from the mere fact of said change in the process or manner of construction, under the circumstances found to exist, which question we shall consider later, the finding does not give rise to an inference of fraud in so far as it concerns the phase of the case now under consideration. The contractors believed that it was impossible to complete said sewer by said monolithic process. The engineer apparently in good faith concurred in such belief, and in the opinion that the sewer would not be serviceable if so constructed, and in a like spirit the engineer consented to the change, and approved the process subsequently adopted and followed. There is nothing in the findings to indicate that the board, as the work progressed and in the final acceptance, did not honestly believe that said change in process was necessary to a completion of the work, or that such board was guilty of any actual fraud in such acceptance, or that such acceptance was induced by the wrongful conduct of others. This we say aside from any force and effect that must be given to the mere fact of such change

in process. While a strict or literal compliance with the terms of the contract is not required, and a substantial compliance satisfies the law, yet the binding effect given to the act of the board in accepting an improvement as complete, does not extend to cover a case in which such board, after contracting for one thing, has accepted something different in its place. The board has no power or authority to bind the property owners by an appeal to the principle of substantial compliance when the work in fact departs radically from the contract and specifications. Cooley, Taxation (2d ed.) 672; *Bond* v. *Mayor* (1869), 19 N. J. Eq. 376; *Church* v. *People* (1898), 174 Ill. 366, 51 N. E. 746; *Cahn* v. *Metz* (1906), 115 App. Div. 516, 101 N. Y. Supp. 392.

It would seem that the terms "substantial compliance" and "radical departure" must be taken to be relative rather than absolute in meaning, and that the force of such terms in their practical application should be shaded somewhat by the exigencies of the occasion or the emergency arising from the surrounding and attending circumstances. *Trimble* v. *Stewart* (1912), 168 Mo. App. 276, 153 S. W. 1086. Moreover, where, as here, it is apparent that the work as constructed departs from the work as specified by the contract, and there must be a determination of the question of whether such departure is so radical and unwarranted as to render the act of accepting it constructively fraudulent and therefore voidable, the fact of whether the improvement as made is such as reasonably to answer the intended purposes, and of whether the departure will affect the usefulness of the improvement, and of whether the objecting property owners have suffered some pecuniary injury therefrom, can not be ignored.

*Holloran* v. *Morman, supra;* Elliott, Roads and Streets §382; *Gage* v. *People* (1901), 56 L. R. A. (Ed. note, p. 923); Page & Jones, Taxation by Assessments §527.

Under the finding, the three necessary elements of such a sewer as is contemplated here are capacity, imperviousness to water infiltration and strength. The sewer as constructed has the same capacity as that specified, and the court expressly finds that a sewer built of such reinforced concrete pipes in a skillful and workmanlike manner would be as impervious to water and as strong as a sewer constructed in accordance with said monolithic process and as specified.

It is argued, however, that the process adopted differs so materially from that specified that, conceding that in the course of the work 7. and after a substantial part of the sewer had been built, water difficulties were encountered of such a nature as to render it practically impossible to continue such process, the board was without power to authorize or ratify such a change as was made here. It is argued that the board was without authority under the circumstances presented to do otherwise than to require the work to continue as specified, although it should be reasonably apparent that the resulting sewer would be worthless, or, if the work should be discontinued as impossible of performance, to adopt new specifications, readvertise and relet the contract. If, under the force of overwhelming circumstances, the contractor should abandon the work when incomplete, the municipality would not be authorized to pay him for the work done, or to require the property owners to do so, as the statute makes no provision for the acceptance of an incomplete improvement or for payment *pro tanto*. *Darnell* v.

*Keller, supra; Gage* v. *People, supra* (Ed. note p. 923).

The argument carried out leads to the conclusion that if any substantial part of such an improvement should prove to be impossible of performance by reason of unforeseen obstacles encountered in the progress of the work, the board would have no authority to arrange with the contractor for the completion of the contract by the use of some process other than that specified, even though the results from the substitution would be eminently satisfactory. Thus, applying the argument, should the water difficulties be such as to interfere with the construction of but 100 feet or ten feet of the sewer by such monolithic process, the board would not be warranted in authorizing such 100 feet or ten feet to be built by some other process just as good, but would be required to stop the work and adopt new specifications, etc., for such portion of the sewer. It can not be said that the board has authority of a certain nature and scope when the affected part of the sewer is of a certain length and an absence of authority, or authority of a different nature or scope when the affected part is of a different length. Hence, carrying the argument to its legitimate conclusion, although the unforeseen difficulties should interfere with the specified construction of but a comparatively inconsiderable portion of the sewer, the board would be required to readvertise, etc., rather than authorize the completion of the work by some other satisfactory process. The argument advanced does not appeal to us as sound.

It is evident that the property owners here were in need of a sanitary sewer and desired that it be constructed. Viewed in the light as it then existed, a monolithic sewer commenced could not be

completed. It is not an unreasonable presumption that had the board been required to adopt new specifications, etc., for the completion of the work, a reinforced concrete sewer would have been specified. On such presumption, assuming the work to have been properly and skillfully done, the people are getting through the direct method of such a change the same structure as would have been built through the roundabout method of reletting, and, as we shall later determine, no one need be wronged. Our conclusion is not unsupported by authority.

In *Meyers* v. *Wood* (1913), 173 Mo. App. 564, 158 S. W. 909, a public improvement contract provided that the sewer contemplated should be built along the center of Main street. While the work was in progress, the contractor encountered extensive deposits of limestone and high pressure water and gas mains. For the work to proceed further along such street would have necessitated blasting to such an extent as to be very expensive, and there would have been danger of bursting said water and gas mains, for the consequent damage to which the contractor would have been required to pay. In consideration of the situation, the city council authorized the contractor to detour the sewer around through an alley a distance of 1,100 feet. In a direct proceeding, brought by the property owners to cancel the tax bill issued on account of said improvement, arguments were advanced in support of the proceeding, substantially the same as here, to the effect that the acceptance of the sewer was void, because the city council exceeded its power in authorizing the change in the route; that there should have been a new ordinance, a readvertisement, and a reletting; that had

it been known that the sewer was to be built through the alley rather than along the street, perhaps there would have been other bidders, etc., and that as a consequence, the property owners were deprived of the benefit of competitive bidding, etc. In sustaining the action of the city council, the court says: "These contentions all raise but one question and that is concerning the *power* of the city and its officials in making the change to the alley instead of requiring the contract to be carried out and the sewer built along Main street.

"The strongest case to which appellants have directed our attention is that of *City of Maryville ex rel. Bank* v. *Lippman,* 151 Mo. App. 447, 132 S. W. 47, where the tax bills were adjudged invalid. On reading the opinion, however, it will be noted that the size of the brick was materially changed by the amended ordinance, and the iron dowel pins to connect the curbing were permitted to be left out. The opinion discusses the question, cites authorities, and holds that this change could not be made without a readvertisement. We thoroughly approve the doctrine therein announced. In that case it was properly held that the changes which were allowed were material changes, and they differ from the changing of or deviating from a line of sewer in this that the requiring of dowel pins and the specification of the size of the brick are matters that can be definitely determined at the time the ordinance contracting the work is passed, whereas it is impossible for the contractor or the engineer or the city officials to know exactly what substance will be encountered in digging a ditch for a sewer. One is a matter of definite ascertainment and the other largely a matter of estimate only. One is known to the city officials and all contractors and the other not

definitely known to any of the parties.   Certain
latitude in judgment must in all public improve-
ment be left to the officials who are intrusted with
the power of seeing that it is done.   There is no
reason to allow them a discretion or the exercise
of their judgment where the thing which they change
was and could be definitely known at the time of
the letting of the contract.   There is a reason, as
before stated, why they should be allowed to ex-
ercise their judgment when they are dealing with a
subject which necessarily develops unknown con-
ditions and predicaments as the work progresses.
Indeed, it is truly said that changing the size of a
brick one-half inch is a material change because
such a change may affect the wearing qualities
of the pavement and thereby materially lessen
the value of the improvement; but here, the sewer
as constructed drains exactly the same territory
as the sewer provided for in the ordinance prior
to the amendment.   In either case it is hidden
and hence does not detract from the looks of the
property.   No more and no less sewer connection
can be made in the one case than in the other.
No fraud or misconduct is shown  on the part of
any one, so far as this record discloses, in making
the change.   To our minds, such change was merely
a variation of the plans as originally made, which
variation was made to overcome the difficulties
found to exist on Main street, and such an ex-
ercise of judgment would not for one moment be
questioned were it made between private persons.
The sewer as constructed served every purpose
and use intended under the ordinance and contract
as orginally made.   This court in the case of
*Stover* v. *City of Springfield*, 167 Mo. App. 328,
152 S. W. 122, held that such a change would not
invalidate tax bills, and to the same effect is the

decision of the St. Louis Court of Appeals in the case of *Gratz* v. *City of Kirkwood and Robert Wycoff*, 165 Mo. App. 196, 145 S. W. 870.  *  *  *

"After all, it must be borne in mind that contractors and city authorities are only human; and they should be held to no higher duty in the use of good sense or good judgment than the ordinary run of men. The opinions holding that a strict compliance with the law is necessary in order to bind the tax-payer on a special tax bill, as we read them, mean a substantial, sensible, businesslike compliance—a practical rather than a theoretical compliance—and courts should view these relations as practical men rather than as theorists."

In *Stover* v. *City, supra,* the sewer was shortened, laterals added and the grade changed. See, also, *Hastings* v. *Columbus* (1885), 42 Ohio St. 585, where, in a street improvement proceeding, the street was widened and a drain added; and *Board* v. *Gibson* (1901), 158 Ind. 471, 63 N. E. 982, where, in performing a contract to build a courthouse, the contractor having excavated to the specified depth, came to quicksand rather than solid ground, whereupon the board, without additional specifications or advertising for bids, arranged with the contractor to excavate deeper and to build a subbasement; and *Smith* v. *Board* (1893), 6 Ind. App. 153, 33 N. E. 243, where in executing a contract for the building of bridge piers unforeseen difficulties were encountered. See also *Edwards* v. *Cooper* (1906), 168 Ind. 54, 64, 79 N. E. 1047; *Bass Foundry, etc., Works* v. *Board* (1888), 115 Ind. 234, 242, 17 N. E. 593; *Board* v. *Cincinnati, etc., Co.* (1891), 128 Ind. 240, 27 N. E. 612, 12 L. R. A. 502; *Board* v. *Newlin* (1892), 132 Ind. 27, 31 N. E. 465; *Sims* v. *Hines* (1890), 121 Ind. 534, 542, 23 N. E. 515; *Board* v. *Silvers* (1864), 22 Ind.

491, 502; *Hellenkemp* v. *City* (1868), 30 Ind. 192; *Holloran* v. *Morman, supra; Lake Erie, etc.,* R. Co. v. *Walters* (1895), 13 Ind. App. 275 , 41 N. E. 465; *Criswell* v. *Board, etc.* (1904), 34 Wash. 420, 75 Pac. 984; *Dugger* v. *Hicks* (1894), 11 Ind. App. 374, 36 N. E. 1085.

As indicated, the specifications provided that in case the exigency should arise calling for any substantial change in the method or process of

8. construction, by reason of unforeseen obstacles, etc., such changes should be made only on the written order of the board. This provision was not followed. The fact of the omission of such written order, however, is not sufficient to invalidate the proceedings. Granting that the power existed to direct or permit the use of such reinforced concrete construction under the circumstances presented, a provision in the specifications that the exercise of such power should be evidenced by writing was not necessary to its validity. If the power to direct or permit the change existed, it could have been exercised by agreement with the contractor, in the absence of any provision in the specifications to that effect. The fact then that said change was made and carried out without a written order was but an irregularity and not sufficient to invalidate the proceedings. *Pittsburgh, etc.,* R. Co. v. *Hays* (1896), 17 Ind. App. 261, 267, 46 N. E. 597; *Dwyer* v. *Mayor* (1902), 77 App. Div. 224, 79 N. Y. Supp. 17. But here the use of said reinforced concrete pipes in place of said monolithic construction was made by agreement between the contractor and the engineer. If the granting of authority so to depart from the

9. literal provisions of the specifications would not have been *ultra vires* as to the board, in case the board rather than the engineer had taken the initi-

ative, then it was within the power of the board to ratify the action of the engineer in said respect. When said matter was first brought to the attention of the board, it did not in terms either approve or disapprove said change in construction, but thereafter it gave said matter frequent consideration, and, as the work progressed, it constantly acquiesced in the action of the contractor and engineer, and in said work as being done, and finally it accepted said improvement with full knowledge that about 13,000 feet of it had been constructed by the use of said reinforced concrete as arranged by the contractor and engineer. Such facts are sufficient to amount to a ratification. *Taber* v. *Ferguson* (1886), 109 Ind. 227, 233, 9 N. E. 723; *Sears* v. *Board* (1899), 43 L. R. A. 834; Page & Jones, Taxation by Assessments §868; *Hett* v. *Portsmouth* (1905), 73 N. H. 334, 61 Atl. 596; *Hitchcock* v. *Galveston* (1877), 96 U. S. 341, 24 L. Ed. 659; *City* v. *Galpin* (1899), 183 Ill. 399, 55 N. E. 73; *City* v. *Shepler* (1899), 190 Pa. 374, 42 Atl. 891, 897; 28 Cyc. 1044; *Weston* v. *Syracuse* (1899), 158 N. Y. 274, 53 N. E. 12, 43 L. R. A. 678, 70 Am. St. 472.

The engineer and contractor, after having examined actual conditions as they then existed, agreed that it was impracticable to continue said monolithic process of construction, and that, should the sewer be so constructed, it would not be serviceable. The board at first passively acquiesced in the conclusion of the engineer and contractor, and later placed the stamp of approval on it by accepting the sewer. There is nothing to indicate that there was any wider departure from the specifications than was honestly believed to be rendered necessary in order that the unforeseen difficulties and obstacles might be met and overcome. Under such cir-

cumstances, we do not believe that the court's finding, based of necessity on theoretical judgment, that it would have been practicable to have continued such monolithic construction should be controlling.

We proceed, however, to consider the effect of the finding that said sewer is defective by reason of unskillful work and the use of improper material. The finding in its bearing on this question may be summarized as follows: The specifications provided that all materials should be of the best quality of their respective kinds; that the sewer should be so constructed as to prevent the seepage of surface water through its walls and joints; that sand and gravel used in manufacturing the pipes should be free from loam, earth, and other foreign substance. The further finding is in substance as follows: Said sewer was constructed as a part of the general sanitary sewer system of said city, and to that end a number of laterals were to be connected into it; that thereby noxious and other impure substances from vaults, cesspools, and like sources might be carried off from the entire territory drained. As designed, it had sufficient capacity to do said work, and also to carry an amount of surface water reasonably in excess of the normal and usual amount. Sewers built by either such monolithic or by such reinforced concrete process are in theory supposed to be water tight, but in actual experience it is found to be impossible to make them so, and as a consequence, under ordinary conditions an amount of seepage bearing some relation to the extent of the territory drained is permissible, which in said Pleasant Run sewer would amount to a total depth in the sewer of approximately two and one-half inches. In the construction of such a sewer, it is of the highest

degree of importance that it be made at least as
nearly water tight as is above indicated, that
thereby an undue amount of surface water may
not seep or flow into the sewer, and that such
noxious substances may be prevented from escap-
ing, which facts, as well as said facts respecting the
design and purpose of said sewer were well known
to the board, engineer and contractor. The sand
and gravel used in manufacturing a substantial
number of said pipes contained a considerable
amount of earth and loam, which pipes were, as a
consequence, inferior in quality and more suscep-
tible to the penetration of water. A substantial
number of pipes with broken ends were used,
leaving openings in the sewer, ranging from slight
to about three inches wide, where said pipes joined
together and also where they connected with the
manholes, which openings were so large in some
instances that they were not closed in the process
of cementing the joints.

When the contractor reported the sewer as
completed, said reinforced concrete portion of it
contained a number of leaky joints, and a number
of pipes were permitting seepage through the walls
and joints thereof, by reason of which the city
engineer declined to approve the sewer, and re-
ported to the property owners that he would not
approve it unless about 3,000 feet thereof was
removed and properly constructed or the joints
thereof caulked with lead and unless and until
said seepage was reduced to not more than two
and one-half inches. Thereafter the contractor
made an ineffectual effort to stop the openings in
the walls and joints of said sewer, but, notwith-
standing such effort, water continued to flow in said
sewer varying from four inches deep at the upper
end to ten inches deep at the lower end of said

reinforced concrete portion, a substantial portion of which water seeped and flowed through the cracks, holes, and openings in the walls and joints thereof. The engineer inspected the sewer after the ineffectual effort to repair it, and thereafter on September 23, 1909, filed said report with said board, wherein he recommended that the sewer be accepted. This report was in part to the effect that the gross carrying and discharging capacity of the sewer was 13.75 cubic feet and the infiltration 3.44 cubic feet, the infiltration therefore being rather more than one-fourth of the gross capacity; that, notwithstanding such excessive infiltration, the capacity of the sewer was sufficient to accommodate the territory for all time to come; that for various reasons such infiltration would steadily decrease in quantity. At or before the time when said engineer reported the completion of said sewer as aforesaid, attorneys representing the property owners, in whose behalf this suit is brought, met with the members of said board informally, and said members thereupon informed said attorneys that no further steps would be taken in said proceeding until said attorneys had received prior notice thereof, but that said report was acted on and said primary assessment roll adopted as aforesaid without giving any notice to said attorneys and without any knowledge on the part of said attorneys, and in the absence of said attorneys, and when no one was present representing the property owners. The court finds that the board in accepting the sewer made no investigation on its own account as to whether the work had been properly done, but that it acted on the judgment of the engineer. The court finds also that said seepage continued practically the same in nature and quantity to the time of the trial, and that said sewer can be repaired

by caulking the open joints and replacing defective pipes, and that thereby it would be rendered serviceable for the intended uses and purposes. The specifications provided that as a prerequisite to the acceptance of said work, the contractor should be required to make and file an affidavit in addition to the certificate of the engineer, to the effect that the work had been completed according to the specifications. The court found that as a rule the board did not require such affidavit, and that it was not required or made in this case.

Heretofore in this opinion, authorities have been cited to the effect that the acceptance of an improvement by the board of public works,

1. after its completion, is conclusive on the property owner in the absence of fraud. Such conclusive effect of an acceptance extends to the character of the work done and material used. *Lux, etc., Stone Co.* v. *Donaldson* (1903), 162 Ind. 481, 485, 68 N. E. 1014. But, if fraudulent or procured by fraud, it is reviewable. *Town* v. *Gorman, supra; Gorman* v. *Johnson, supra.*

In *Lux, etc., Stone Co.* v. *Donaldson, supra*, it seems to be held that such an acceptance can be impeached only on account of the fraud of the accepting body in the act of acceptance, and that the prior or contemporaneous fraudulent conduct of others by which such acceptance is induced is not sufficient to that end, the reason assigned being that the complaining parties have a right to present to such accepting body every legal reason why the improvement should not be accepted, including all accusations of fraudulent conduct on the part of the engineer, contractor, etc. At least on first view, a later case (*Gorman* v. *Johnson, supra*), seems to be in conflict with *Lux, etc., Stone Co.* v. *Donaldson.* In the former it is said: "It has also

been argued that the only fraud, upon proof of which the order of acceptance could be set aside, is the fraud of the board of trustees; or, in other words, that a judgment can be set aside for fraud by the court, but not because of fraud upon the court by the prevailing party. That is necessarily not the law." *Gorman* v. *Johnson, supra,* has received the approval of the Supreme Court by the denial of a petition to transfer, and it is therefore recognized as sound both by that court and this.

In *Zorn* v. *Warren-Scharf Co.* (1908), 42 Ind. App. 213, 84 N. E. 509, an explanation of *Lux, etc., Stone Co.* v. *Donaldson, supra,* is suggested to the effect that the attack there was collateral. The attack in *Gorman* v. *Johnson, supra,* was direct, and such is the nature of the attack here. Perhaps it is well also to call attention to the scope of the hearing afforded by the statute under which *Lux, etc., Stone Co.* v. *Donaldson, supra,* was decided, as cited and construed therein. While doubtless, independent of statute, the board would have authority to grant a more comprehensive hearing, the statute involved here, and also in *Gorman* v. *Johnson, supra,* provides for a hearing at the stage of the proceedings under consideration only on the question of the amounts of the assessments and of special benefits. There is no provision for an appeal, but a landowner feeling aggrieved may obtain a review of his assessment on petition to the circuit court. §8725 Burns 1908, §8725 Burns 1914, Acts 1907 p. 563.

The finding here does not show actual fraud on the part of said board in accepting said work as completed, or that such acceptance was induced by positive fraud on the part of the engineer, contractor, or other person. However, an action-

able grievance can not be based on the mere fact of fraudulent or wrongful conduct in a completed act. Unless such conduct results in injury to the complaining party, no action can be maintained. It therefore follows that the injury is a very substantial part of such a cause of action. In fact the injury may be so grave as to force the conclusion that the unexplained conduct that caused it is fraudulent. Such fraudulent conduct so deduced is known as constructive fraud or fraud in law. It may exist in the absence of any real purpose or intention to do a wrong or to inflict an injury. It consists in "an act which the law declares to be fraudulent without inquiring into the motive." 20 Cyc 9.

An inference of fraud can not be deduced from the mere fact that the improvement does not comply strictly with the specifications. As indicated earlier in this opinion, a substantial compliance satisfies the law. In determining whether there has been such a substantial compliance as repels an inference of fraud, some latitude must be allowed for the exercise of judgment on the part of the board, as otherwise to give the board the power to accept would be empty and useless. The power to accept then of necessity includes a right to exercise a discretion, but such discretionary power is not so broad as to authorize the board to bind the property owner by an acceptance of a work entirely different from that required by the contract or one that is totally worthless. Elliott, Roads and Streets (2d ed.) §586. "Much depends upon whether or not the improvement, as made, is such as to answer the intended purposes—as to whether or not the work, as done, will affect the usefulness of the improvement—and upon an answer to the question

as to whether the departure has been to the prejudice of the property owner." *McCain* v. *City* (1905), 128 Iowa 331, 103 N. W. 979; *Gage* v. *People, supra* (Ed. note, p. 923); Page & Jones, Taxation by Assessment §537.

There are defects in the sewer here, for the existence of which no excuse is offered or found. As to some of them it would seem that there could be no excuse. Thus, in the place of using pure, clean, sand and gravel of the quality specified, sand and gravel containing considerable portions of earth and loam were used in the manufacture of a number of pipes. The trial court found as a fact that such sewer pipes so manufactured were inferior in quality. The contractor was bound to know, and said engineer and the inspectors that assisted him should have known of the use of said impure material and of the consequent effect. Broken and cracked pipes were used, and as a result there were openings in the sewer. In some cases the joints were not closed by being cemented. It is found as a fact that the board, engineer, and contractor knew it to be of the highest degree of importance that a sewer such as this be constructed so as to exclude surface water, at least in excess of the amount found to be permissible. By calculation it may be ascertained that such permissible amount is about four and one-half per cent. of the capacity of the sewer, while the actual amount of seepage as reported to the board by the engineer is in excess of twenty-five per cent. of such capacity. The board, with knowledge of such fact and that said principle found to be of the highest degree of importance was thereby violated, accepted the sewer.

The trial court finds that said sewer can be properly completed by cementing the joints, etc., and that it will then be serviceable. The board

should have required this to be done before accepting the work. Under the circumstances, we hold that the acceptance of the sewer as complete is not binding on the complaining property owners. See the following: *McCain* v. *City, supra; City of Maryville, ex rel. Bank* v. *Lippman* (1910), *supra;* 4 McQuillan, Municipal Corp. §1929; *Tredwell* v. *City* (1896), 11 App. Div. 224, 43 N. Y. Supp. 458; *Meyers* v. *Wood, supra; Eiermann* v. *Milwaukee, supra.*

It may be said that the argument supporting our conclusion that on account of said unskillful work, and the use of the improper material, the contract has not been performed, applies with equal or greater force to the fact that such reinforced concrete pipes were substituted for such monolithic work. Ordinarily this would be true, but the facts found by the court are sufficient to justify said change in the method of construction, especially since the court found in substance that the substituted form of construction is as good as the specified, where the work is properly done.

The tenth conclusion of law is to the effect that Lizzetta Alsmeier and said sixty other appellants are estopped from contesting said assessment roll. Such estoppel is based on facts found by the court respecting each appellant, and deemed by the trial court sufficient to establish that each appellant respectively had knowledge of said change in method of construction, and neglected seasonably to protest against such change. Under our holding that the special existing circumstances justified the use of such reinforced concrete construction, the facts found as constituting such estoppel become unimportant. There is no answer presenting the issue of estoppel as directed against the fact of unskillful work and the use of poor material, resulting in a defective

sewer. Assuming, however, that such issue is presented, the facts found are not sufficient as a basis for a conclusion of estoppel as against such defective sewer, resulting from unskillful work and poor material, as aforesaid.

The facts are fully found by the court, and as a consequence it is not necessary that there be a new trial on reversal. If said acceptance be set aside, an opportunity will thereby be afforded the representatives of the contractor to complete the sewer as indicated by the finding. Thereafter, in any proceeding to procure the acceptance of the sewer as completed, the matter of any saving to the contractor, if any, by reason of the cost of said substituted method of construction, as compared with the cost of the specified construction, under ordinary conditions, can be adjusted. *Criswell* v. *Board, etc., supra.*

For error in the first and tenth conclusions of law, and consequent error in the ninth, the cause is reversed, with instructions to restate the conclusions to the effect that, under the circumstances presented by the finding, the board of public works must be held by its subsequent conduct to have ratified the substitution of such reinforced concrete construction for such monolithic construction, and, having so done, it acted within its authority under the special circumstances presented by the finding; that for unskillful work and the use of poor material, resulting in a defective sewer, as shown by the finding, the acceptance of said sewer and the making of said primary assessment roll and all subsequent proceedings thereon should be set aside as against plaintiffs and others for whom this action is brought as aforesaid, being said Lizzetta Alsmeier and said sixty other appellants and Margaret E. Adams and said 170 other appellees; that the costs should be taxed one-half thereof against said Margaret E. Adams

and said 170 other appellees, and one-half thereof against appellees Kuhn and Defrees, administrators.

## ON PETITION FOR REHEARING.

CALDWELL, J.—Margaret E. Adams and the 170 other appellee property owners, hereinafter designated as appellees, in whose favor judgment was rendered by the trial court, appearing specially to that end, have petitioned for a rehearing and moved for a modification of the mandate entered on this appeal. The basis of the combined petition and motion by which such relief is sought, stated generally, is as follows: That the sole foundation of this appeal as prosecuted by appellants is the alleged error of the trial court in stating its tenth conclusion of law; that appellees filed in this court a confession of error as to said conclusion, whereby this court acquired jurisdiction over the persons of appellees only for the purpose of adjudicating respecting the correctness of such conclusion; that cross-errors were subsequently assigned by appellees Kuhn and Defrees, administrators, hereinafter designated cross-appellants, but that appellees were not served with notice of the same, and they did not appear thereto, and consequently that this court did not acquire jurisdiction over appellees in their relation to such cross-errors. Appellees ask as relief that on a rehearing being granted, the court modify the mandate by striking therefrom all that relates to appellees. In aid of the petition and motion the following facts sustained by the record, except as otherwise indicated by us, are brought to our attention: The judgment of the trial court consists of three paragraphs or specifications: By the first specification, which is based on the ninth conclusion of law, the city of Indianapolis, its officers and agents, the contractor, and all persons claiming under or through

him, are perpetually enjoined from taking any steps to collect assessments against the respective properties of appellees on account of said sewer, and the respective titles of appellees in and to said properties are quieted as against any lien or claim on account of said sewer or arising out of said assessments. By the second specification, which is based on the tenth conclusion of law, it is adjudged in effect that appellants are not entitled to a decree restraining and enjoining the collection of said sewer assessments as made against their respective properties, or quieting their title to such properties as against such assessments. The foundation of this specification is estoppel. By the third specification the costs are adjudged against the contractor and the city, except that the costs made by each appellant are adjudged against him.

Further facts brought to our attention respecting steps taken in 1913 are as follows: On June 11, appellants served appellees with notice of appeal. On June 14, appellants filed the transcript and proofs of notice and assigned error, and at the same time appellees confessed error. As we have said, the sole error assigned by appellants challenged the tenth conclusion of law. The confession of error as filed was several in form, and was to the effect that each appellee confessed that as far as he was informed or knew, appellants' assignment of error was true, and that the court did err in said conclusion. Wherefore, each appellee declined to defend this cause on appeal, and asked that no costs be taxed against him. Appellants' assignment of error is signed by one of the attorneys who afterwards filed briefs in behalf of appellants. The confession of error is signed by other attorneys. On July 22, appellants' briefs were filed. On September 5, the cross-

appellants assigned cross-errors and filed their briefs in answer and on their cross-errors. Appellants filed their reply briefs and in answer on the cross-errors September 30. November 1, the cross-errors were amended on petition filed October 6, and permission granted over opposition October 29. Appellees were not served with notice on the cross-errors or of the assigning thereof, and in no manner appeared thereto, save as hereinafter set out, and hence the argument that this court has not acquired jurisdiction over the persons of appellees to render any decision based on the cross-errors affecting their interests. It therefore becomes necessary to ascertain what relation appellees bear to the subject-matter of the cross-errors, and what attitude they have assumed on this appeal, and especially respecting the cross-errors. The cross-errors are to the effect that the court erred: (1) In overruling the demurrer to the complaint; (2, 3, 4, and 5 respectively) that the court erred in the first, second, seventh and ninth conclusions of law respectively. The substance of the first, ninth and tenth conclusions of law is set out in the original opinion. The second is to the effect that the act of the city officers in extending the assessment roll on account of said sewer and in entering it on the books of the city treasurer was wrongful and void as to all property owners who made seasonable objection to the manner in which the sewer was constructed; and the seventh, that the mere fact that the properties of certain parties who were property owners had been connected with the lateral sewers which empty into the Pleasant Run interceptor sewer does not constitute such an acceptance of the sewer as to preclude such parties from contesting the assessment against their respective properties. In their relation to appellants and appellees, it is apparent without elabora-

tion that the error and cross-errors assigned involve their interests as follows: That the tenth conclusion of law and the error assigned thereon by appellants affect appellants alone; that the ninth conclusion of law and cross-errors assigned thereon affect appellees alone; that the first, second, and seventh conclusions and cross-errors assigned thereon and cross-error assigned on the ruling on the demurrer to the complaint might affect both appellants and appellees; that is, appellants and appellees alike were interested in sustaining the ruling on the demurrer to the complaint, and the action of the court in deducing the first, second and seventh conclusions, but the ninth conclusion, which related only to appellees, did not particularly concern appellants, and the tenth conclusion, which related only to appellants, did not particularly concern appellees. Appellants and appellees indicated their attitude towards the ninth and tenth conclusions, in that appellants did not challenge the former on their appeal, and appellees confessed error as to the latter.

Such being the condition of the appeal, it is urged, as indicated, that notice to appellees of the assigning of cross-error was a prerequisite to jurisdiction over their persons. If appellees appeared to the cross-errors, or to the appeal in its relation to the cross-errors, it thereby becomes unimportant whether they were served with such notice. We, therefore, proceed to determine whether there has been such an appearance.

If there has been such an appearance by appellees, it consists in the nature and contents of the brief filed September 30, 1913, and denominated "Reply Brief of Appellants." This brief is in reply to the answer brief filed in behalf of the cross-appellants on appellants' assignment of error, and also in answer to the argument contained in that brief in support of the

assignment of cross-error. In so far as concerns the cross-errors, the "Reply Brief of Appellants" in the main is directed against assignments Nos. 1, 2, 3, and 4. As we have indicated, the nature of these assignments is such that, if sustained, two results would follow: (1) The judgment appealed from would not necessarily be reversed, even though the tenth conclusion of law considered alone were erroneous; (2) the foundation supporting the ninth conclusion of law would be undermined so that it could not stand if challenged by an assignment.

The fact of the first result justified counsel as representatives of appellants alone in defending against said assignments, and they could not thereby be held as representing appellees, even though the nature of such defense was such as appellees might well make in their own behalf as against such assignments. But said brief is broader than as indicated. It contains a complete argument in support of the ninth conclusion of law challenged by the fifth assignment of cross-error, and in which appellees alone are interested. Thus, on page 4 of such brief counsel declare their purpose to champion the cause not only of appellants, but also of appellees, using the following language: "So far as questions relating to the reversal of the judgment in favor of cross-appellants are concerned, the interests of the 171 appellees who recovered judgment pursuant to the ninth conclusion of law, and the 63 appellants who were denied relief, pursuant to the tenth conclusion of law, are identical, and the argument in favor of appellants on the cross-errors is also in favor of the 171 coparties in the trial court who are appellees here." Under the head of "Propositions Relied On", counsel by proposition No. 8 on page 7 declare their purpose to uphold the ninth conclusion of law by upholding the first conclusion. As stated, peti-

tioning appellees alone are interested in sustaining
the ninth conclusion.   On page 35· an argument is
advanced in behalf of appellees to the effect that
Kuhn is not shown to have any interest in the sub-
ject-matter of the litigation, and that in the absence
of such interest he could not appeal from the judg-
ment rendered, in favor of the petitioning appellees,
"which was that 171 of the appellees recover costs
and an injunction against Defrees and others."
In the case at bar, an injunction was entered in
favor of the appellees only.   On  page  39  counsel
argue in justification of the injunction, and that
authorities cited by the cross-appellants do not
mitigate against the trial court's decision that the
injunction issue.   On page 56 counsel state a prop-
osition in support of the ninth conclusion of law
which is the immediate foundation of the judgment
in favor of appellees, and the brief  closes with a
summing up in support of all the conclusions of law
challenged by the cross-errors. It thus appears that
the cause of appellees in its relation to the cross-
errors was in fact fully presented for the considera-
tion of this court, with no sort of an intimation that
appellees were not thereby making a full appearance.
On such presentation this court, as appears from the
original opinion, considered and decided all the
questions material to a complete determination
of the issues arising on both the errors and the cross-
errors assigned.

   An attorney as a member of the firm whose name
appears signed as attorneys for appellees to said
confession of error, which firm represented
16.   both appellants and appellees in the trial court,
and signed, filed and presented the motion for
a new trial and reserved exceptions to the conclusions
of law for appellants, supports the petition for a
rehearing and the motion to modify the mandate by

his affidavit. This affidavit recites, among other things, that his firm represented the petitioning appellees in the trial court; that as a member of such firm, he signed its name to the said confession of errors, and that thereafter neither he nor said firm took any part in the conduct of the appeal, or in defending it in behalf of appellees or otherwise. There is no statement in said affidavit, and it does not otherwise appear, that said other attorneys who prepared and filed said reply brief did not have authority to brief the cause in behalf of appellees. It is improbable, if not inconceivable, that they would do so and thereby procure this court fully to consider the cause in its relation to said appellees in the absence of such authority. In any event the fact remains undisputed and indisputable that the attorneys last mentioned did brief the appeal in full and in the interest of appellees. The contrary not appearing, it is presumed that they had authority to do so. 2 R. C. L. 325; 6 Cyc 488, and cases.

The brief being on the merits of the cause, and filed pursuant to such presumed authority, constituted an appearance. It follows that the petition for a rehearing should be denied, and the motion to modify overruled.

Petition for a rehearing denied, and motion to modify the mandate is overruled.

NOTE.—Reported in 105 N. E. 1033, 109 N. E. 58. Authority of attorney to bind client, 76 Am. Dec. 256; 30 Am. Rep. 358; 6 C. J. 631; 4 Cyc 928.