## SALT LAKE CITY et al. v. UTAH LIGHT & TRACTION COMPANY.

No. 3209.   Decided May 2, 1918.   (173 Pac. 556.)

1. CONSTITUTIONAL LAW—POWER TO FIX RATES—LOCAL AUTHORITIES —STREET RAILROADS. Since Const. art. 12, section 8, providing no law shall grant the right to operate a street railway within any city without its consent, does not, in express terms, delegate the power to fix rates, a franchise ordinance, made pursuant thereto, fixing passenger rates, and accepted by a street railway company, although it constitutes a binding contract between the parties, is subject to the rate-making power of the state.[1] (Page 216.)

2. CARRIERS—POWER TO FIX RATES—STREET RAILWAYS—CONTRACTS— FRANCHISE. Laws 1917, c. 47, art. 3, section 5, subd. "c," pro-

[1]*Brummit* v. *Ogden Waterworks Co.*, 33 Utah, 289, 93 Pac. 829.

viding, "Nothing in this act contained shall be construed * * * to prevent the carrying out of contracts for free or reduced rate passenger transportation or other public utility service heretofore made, founded upon adequate consideration and lawful when made," was not intended to apply to commutation rates fixed in a franchise ordinance.   (Page 223.)

3. CARRIERS—PASSENGER RATES—COMMUTATION TICKETS—ESTOPPEL. That a street railway franchise called for commutation tickets, and in reliance thereon many persons built homes in the suburbs of the city along the street railway, does not estop the company from raising the rates by permission of the Public Utilities Commission, granted under laws 1917, c. 47, art. 4, sections 1, 3.   (Page 224.)

4. PUBLIC SERVICE COMMISSIONS—FINDINGS.  While the Public Utilities Commission should be careful to make proper findings respecting material ultimate facts upon which an order is based, where the findings and opinion, considered together, are such that more specific findings would benefit no one, they are sufficient.  (Page 226.)

5. PUBLIC SERVICE COMMISSIONS—REVIEW.  Under Laws 1917, c. 47, art. 5, section 15, providing for review of proceeding before the Public Utilities Commission, all the Supreme Court can review is whether there is any evidence to sustain the findings of the Commission, whether it has exercised its authority according to law, and whether any constitutional rights of the complaining party have been invaded or disregarded.  (Page 226.)

6. CONSTITUTIONAL LAW—COURTS TO BE OPEN.  The constitutional provisions (article 1, section 11) that the courts shall be open and that "every person for an injury done to him * * * shall have remedy by due course of law," apply to judicial questions; and, unless a railroad rate as fixed by the Public Utilities Commission is either clearly oppressive or confiscatory, no judicial question is presented.  (Page 226.)

Original proceeding by writ of review, obtained by Salt Lake City, Murray City, the Affiliated Commercial Clubs of Salt Lake County, and E. A. Walton, to review order of Public Utilities Commission, authorizing the Utah Light & Traction Company to increase fares on its street railway system.

Findings and order of the Commission affirmed.

*W. H. Folland, Horace H. Smith, W. W. Little, Walton & Walton* and *D. W. Moffatt* for plaintiffs.

*J. F. MacLane* and *Bismarck Snyder* for defendant.

FRICK, C. J.

The Utah Light & Traction Company, a corporation own-
ing and operating a street railway system in Salt Lake City
and suburbs, hereinafter called defendant, made application
to the Public Utilities Commission of Utah, hereinafter called
commission.  The defendant made application to the commis-
sion in due form to be permitted to increase or raise the fares
for transportation on its street railway system for the alleged
purpose of meeting the increased costs and expenses incident
to the maintenance and operation of its railway system in Salt
Lake City and suburbs.  The defendant's street railway sys-
tem extends throughout Salt Lake City, which now has a popu-
lation of approximately 115,000, and from thence to Murray
City, which is located about five miles south of Salt Lake City,
and from thence south and southwesterly in Salt Lake County
to two other small towns.  It also owns and operates a branch
line running northwesterly from Salt Lake City to the town
of Bountiful, which is about fourteen miles from Salt Lake
City.  After the application was filed, Salt Lake City, Mur-
ray City, and the other plaintiffs named in the title ap-
peared before the commission and opposed the application.
A hearing was had before the commission, at which much evi-
dence was produced, both for and against the application.
After the hearing was concluded the commission in due time
rendered an opinion and made findings whereby it in effect
found that, owing to the increase in the cost of labor and ma-
terial, etc., the defendant was entitled to some relief, although
not all of the relief prayed for.  The commission therefore
made an order, authorizing the defendant to raise its fares in
certain particulars, to which we shall make more specific ref-
erence hereinafter.  The application of the defendant, the
hearing, and the order of the commission were had and made
in pursuance of chapter 47, Laws Utah 1917, p. 128, popularly
known as the Utilities Act, which hereinafter will be referred
to by that name.  The Utilities Act is too long for insertion
here.  We shall, however, refer to such portions as are deemed
material in the course of the opinion.  It may be stated here,
however, that the Utilities Act of this state does not differ

materially from similar acts in force in many of the other states in the Union. The general jurisdiction of the commission is defined in section 1, art. 4, of the act in the following words:

"The commission is hereby vested with power and jurisdiction to supervise and regulate every public utility in this state, as defined in this act, and to supervise all of the business of every such public utility in this state, and to do all things, whether herein specifically designated, or in addition thereto, which are necessary or convenient in the exercise of such power and jurisdiction."

Section 3 of the same article also confers power on the commission as follows:

"Whenever the commission shall find after hearing that the rates, fares, tolls, rentals, charges, or classifications, or any of them, demanded, observed, charged, or collected by any public utility for any service or product or commodity, or in connection therewith, including the rates or fares for excursion or communtation tickets, or that the rules, regulations, practices, or contracts, or any of them affecting such rates, fares, tolls, rentals, charges, or classifications, or any of them are unjust, unreasonable, discriminatory or preferential, or in any wise in violation of any provisions of law, or that such rates, fares, tolls, rentals, charges, or classifications, are insufficient, the commission shall determine the just, reasonable, or sufficient rates, fares, tolls, rentals, charges, classifications, rules, regulations, practices, or contracts to be thereafter observed and in force, and shall fix the same by order as hereinafter provided.

"The commission shall have power to investigate a single rate, fare, toll, rental, charge, classification, rule, regulation, contract, or practice, or any number thereof, or the entire schedule or schedules of rates, fares, tolls, rentals, charges, classifications, rules, regulations, contracts, and practices, or any number thereof of any public utility, and to establish, after hearing, new rates, fares, tolls, rentals, charges, classifications, rules, regulations, contracts, or practices, or schedule or schedules, in lieu thereof."

For the purpose of review the act provides for rehearings before the commission in all cases. Section 15 of article 5, so far as material here, provides that within thirty days after an application for a rehearing is granted or denied an application may be made to this court "for a writ of certiorari or review." After specifying how and when the writ shall be issued and returned, that section provides:

"The case shall be heard on the record of the commission as certified to by it."

The section then proceeds:

"The review shall not be extended further than to determine whether the commission has regularly pursued its authority, including a determination of whether the order or decision under review violates any right of the petitioner under the Constitution of the United States or of the state of Utah. The findings and conclusions of the commission on questions of fact shall be final and shall not be subject to review."

As before stated, the commission found the facts and made an order in favor of the defendant, and the plaintiffs have applied for and obtained a writ of review as above stated, and the case has been presented to this court upon plaintiffs' objections to the findings and order of the commission.

We remark that, while the Attorney General appeared on behalf of the commission, as he is required to do by the Utilities Act, yet he has filed no brief or argument in the case.

Twenty-three specific reasons are assigned by plaintiffs why the order made by the commission should not prevail. It is not necessary to refer to all of those reasons in detail, and we shall now proceed to consider those which come within the powers conferred on this court by the Utilities Act, and which we deem material to the controversy.

The first, and perhaps the principal, contention made by the plaintiffs is that the commission, by its order, has set aside and annulled the contracts which were entered into between the defendant and Salt Lake City and between the defendant and Murray City wherein the rates or fare that the defendant was authorized to charge and collect were agreed upon and

fixed. The contracts just referred to are in the form of ordinances which were duly adopted both by Salt Lake City and Murray City pursuant to article 12, section 8, of the Constitution of this state which was in force at the time the ordinances were passed. The constitutional provision just referred to reads as follows:

"No law shall be passed granting the right to construct and operate a street railroad, * * * within any city or incorporated town, without the consent of the local authorities who have control of the street or highway proposed to be occupied for such purposes."

The ordinances or contracts will hereinafter be referred to as the franchise ordinances.

In this connection we at this time also desire to call attention to two other constitutional provisions that are deemed material, namely article 12, section 12, which provides:

"All railroad and other transportation companies are declared to be common carriers, and subject to legislative control."

—and to section 15 of the same article which provides:

"The Legislature shall pass laws establishing reasonable maximum rates of charge for the transportation of passengers and freight, for correcting abuses, and preventing discrimination and extortion in rates of freight and passenger tariffs by the different railroads, and other common carriers in the state, and shall enforce such laws by adequate penalties."

In view, therefore, that section 8 of the article of the Constitution referred to prohibits the Legislature from passing any law by which any street railway may be constructed or operated in the cities and towns of this state without the consent of the local authorities, plaintiffs contend that the authorities of the cities and towns have the exclusive right and power to impose the conditions upon which street railways may be constructed and operated in cities and towns and that the right to determine and fix rates of fare is necessarily implied in the foregoing section. In the franchise ordinances which were adopted by both Salt Lake City and Murray City, and the terms of which were accepted by the defendant, what is

termed the "regular fare" was fixed at five cents for one continuous ride, and in addition to such fare the defendant also agreed as follows:

"Said grantee further hereby agrees that it will issue commutation tickets of fifty fares for two dollars, the holders of which tickets shall have the same transfer privileges accorded to passengers paying regular fare, and shall also issue to students of public schools commutation tickets of fifty fares for one dollar and fifty cents, with transfer privileges as aforesaid, good only to and from school attended by such students, and good only on days when school is in regular session between the hours of 7:30 o'clock a. m. and 5:30 o'clock p. m. City policemen and firemen in uniform shall be entitled to free passage on regular cars."

Transfer rights were also provided for in the franchise ordinances.

The defendant, in connection with other privileges, accepted all of the provisions contained in the foregoing ordinances, and has operated its street car system in conformity therewith.

The commission, in its order, relieved the defendant from issuing the so-called $2 commutation tickets, and authorized it to charge and collect a fare of five cents for each continuous ride in Sale Lake City and to charge a five cent fare for each zone in certain zones outside of the city. The commission also changed the rate somewhat in other particulars on defendant's system operated outside of Salt Lake City and Murray City, all of which rates had been fixed in the franchise ordinances. In view, however, that a decision upon the so-called $2 commutation tickets settles all questions affecting the increase of rates, it is not necessary to set forth the other changes that were made by the commission.

The order of the commission increasing the fares as aforesaid presents three questions: (1) Did the passing of the franchise ordinances fixing the fares and their acceptance by the defendant constitute a contract between Salt Lake City and the defendant and between Murray City and the defendant? (2) If the franchise ordinances constituted contracts, was it within the power of the Legislature

to authorize the commission to change the fares? (3) Does the constitutional provision by which the city authorities are given the exclusive right to permit or to refuse permission to street railway companies to construct and operate street cars within the cities of this state prevent the state, through its Legislature, from exercising its sovereign prerogative to regulate and change the fares fixed in the franchise ordinances?

In view that the franchise ordinances after acceptance by the defendant possess all the elements of a contract, and that such ordinances are generally regarded by the courts as constituting contracts binding as between the parties, we, for the purposes of this decision, shall treat them as contracts binding alike on Salt Lake City and on Murray City and on the defendant to the extent hereinafter stated. The answer to the first question must therefore be in the affirmative.

The second proposition, for the reasons herein stated, in our judgment, must also be answered in the affirmative, while the answer to the third question, under the great—the overwhelming—weight of authority must be answered in the negative. The second and third questions, however, logically blend, and for that reason we shall treat them together.

We may as well at this point consider the contention of plaintiffs that by reason of the constitutional provision above referred to, which prohibits the Legislature from interfering with the city authorities in authorizing the construction and operation of street railways, the Legislature is likewise powerless to authorize the commission to interfere with any rates that have been fixed by the franchise ordinances as before stated. To do that, plaintiffs insist, is not only ''impairing the obligation of contracts'' (which is prohibited by both the federal and state Constitutions), but amounts to a complete nullification of such contracts. This objection has often been made in cases where either the city or the street car company has sought relief from a rate fixed by franchise ordinances like those in question here. It should be observed, however, that where the controversy has arisen between the contracting parties merely, and in ordinary actions or proceedings, the courts have usually compelled compliance with the provisions

of the franchise ordinances treating them as contracts. Where, however, as here, the application was made to Utilities Commissions in pursuance of a legislative act, the courts have, with few exceptions, held that a constitutional or statutory provision prohibiting the Legislature from passing laws authorizing the construction and operation of street railways in cities without the consent of the local authorities does not authorize such authorities to fix rates which may not be changed by the Legislature or by a utilities commission created for that purpose. In other words, it is universally held that the regulation and fixing of rates is a governmental function, that is, a legislative function, which will not be deemed to have been surrendered by the sovereign state unless it has been done in clear and unequivocal terms. A mere cursory reading of section 8 of the Constitution, which we have before quoted, shows that no express right is conferred upon the local authorities of this state to enter into any contract respecting the fixing of rates. True it is that in determining the conditions upon which street railways may be constructed and operated within the cities the local authorities may determine the fares that may be charged and collected. The authority to do that is, however, merely implied, and there is nothing in the Constitution which prohibits the Legislature from exercising its prerogative in changing the rates of fare in case they are found to be unreasonable, unfair, or oppressive as against the public on the one hand and unfair or unjust, or confiscatory, as against the railway company upon the other. Such right is an attribute of sovereignty, and is always reserved to the state unless expressly delegated or surrendered. Whether the right and corresponding duty of the state to regulate rates can be surrendered at all is not before us now, and as to that we express no opinion. It is manifest that the constitutional provision does not in express terms delegate or surrender such a power to the city authorities, and it is equally manifest that there is nothing in the provision from which such a power is necessarily implied.

In this connection it must also be remembered that by another constitutional provision, which we have also quoted

above, the duty of passing laws by which maximum rates to be charged by all common carriers shall be established is especially imposed on the Legislature. The right to regulate the rates or charges demanded by common carriers was therefore not only reserved to the state when acting in its governmental capacity, but the duty to regulate and fix maximum rates or charges is expressly imposed on the Legislature without any exceptions. In passing the Utilities Act the Legislature therefore merely complied with the constitutional mandate, and the commission is the mere arm of the Legislature through which the constitutional mandate aforesaid is made effective.

All of the foregoing propositions are exhaustively considered, and are sustained by the following authorities: *Home Telephone, etc., Co.* v. *City of Los Angeles,* 211 U. S. 265, 29 Sup. Ct. 50, 53 L. Ed. 176; *Benwood* v. *Public Service Commission* (1914) 75 W. Va. 127, 83 S. E. 295, L. R. A. 1915C, 261; *State ex rel.* v. *Superior Court* (1912) 67 Wash. 37, 120 Pac. 861, L. R. A. 1915C, 287, Ann. Cas. 1913D, 78, approved in *Puget Sound Tr. Co.* v. *Reynolds* (1917) 244 U. S. 574, 37 Sup. Ct. 705, 61 L. Ed. 1325; *Milwaukee E. R. & L. Co.* v. *Railroad Commission* (1913) 153 Wis. 592, 142 N. W. 491, L. R. A. 1915F, 744, Ann. Cas. 1915A, 911, affirmed in 238 U. S. 174, 35 Sup. Ct. 820, 59 L. Ed. 1254; *City of Woodburn* v. *Public Service Commission* (1916) 82 Or. 114, 161 Pac. 391, L. R. A. 1917C, 98; *Denver & S. P. Ry. Co.* v. *Englewood* (Colo. 1916) 161 Pac. 151; *City of Pawhuska* v. *Pawhuska Oil & Gas Co.* (Okl. 1917) 166 Pac. 1058; *Collingswood Sewerage Co.* v. *Borough of Collingswood* (N. J. 1918) 102 Atl. 901; *Northampton, etc., Co.* v. *Board of Public Utilities* (N. J. 1918) 102 Atl. 930; *People* v. *Public Service Commission* (1916) 175 App. Div. 869, 162 N. Y. Supp. 405; *In re Huntington R. Co.,* P. U. R. 1918A, 249; *Public Utilities Commission* v. *Chicago & W. T. Ry. Co.* (1916) 275 Ill. 555–572, 114 N. E. 325, Ann. Cas. 1917C, 50; *City of Chicago* v. *O'Connell* (1917) 278 Ill. 591, 116 N. E. 210; *Winfield* v. *Public Service Commission* (Ind. 1918) 118 N. E. 531.

In *State ex rel.* v. *Superior Court,* supra, in the course of the opinion, it is said:

"The power to fix rates, if exercised by a city, unless that power is clearly expressed by legislative grant, is in the nature of a license, and is revocable at the will of the Legislature when, in its judgment, the common good demands its reassertion. The state does not act by contract, but by grant, license, or reservation. It is not usually bound by the contracts of others when exercising its police power. So jealous is it of the sovereignty of its police power that, in the case of the Home *Tel. Co.* v. *Los Angeles,* the Supreme Court of the United States held that a grant by the Legislature of the state of the right 'to fix and determine charges for telephone, telephone service, and connections,' did not carry with it the right to agree upon rates. In other words, as that court and others have universally held, the delegation of power must be 'clear and unmistakable.' In dealing with the sovereign power of the people, nothing can be left to inference. The court accordingly said that, the power to fix and determine rates being within the police power, the city might establish rates, but that it could not, under the delegation quoted, contract so as to bind itself or the other party as against the exercise of the police power. In principle its holding could not have been otherwise, for the strength of the police power lies in the fact that it is not a subject of contract; that it cannot be bartered or bargained away."

In *Puget Sound Tr. Co.* v. *Reynolds,* supra, the court uses the following language:

"Assuming (what is not clear) that the provision in the franchise ordinance respecting the rates of fare and the transfer privilege are contractual in form, still it is well settled that a municipality cannot, by a contract of this nature, foreclose the exercise of the police power of the state unless clearly authorized to do so by the supreme legislative power."

In *Milwaukee E. R. & L. Co.* v. *Railroad Commission,* supra, the court, in the course of the opinion, says:

"Assuming that under this language a city might make a contract with a public utility, fixing rates or tolls for a definite period, which would bind the city itself and prevent any change of rates by the city authorities during the period, the question still remains whether the section can be construed as giving the city authorities any power to bargain away the sovereign right of the state to regulate fares and tolls and lower them, if found to be excessive. If this question were a new one in this state, we should entertain no doubt that it should be answered in the negative, but we cannot regard it as new."

While it is true that two of the justices dissented from the majority opinion in the foregoing case, yet it is equally true that the case was taken to the Supreme Court of the United States, where the opinion of the majority was affirmed.

In the case of *Woodburn* v. *Public Service Commission,* supra, the Supreme Court of Oregon, in passing on the question here involved, in the course of the opinion, said:

"The right of the state to regulate rates by compulsion is a police power, and must not be confused with the right of a city to exercise its contractual power to agree with a public service company upon the terms of a franchise. The exercise of a power to fix rates by agreement does not include or embrace any portion of the power to fix rates by compulsion. When Woodburn granted the franchise to the telephone company, the city exercised its municipal right to contract, and it may be assumed that the franchise was valid and binding upon both parties until such time as the state chose to speak; but the city entered into the contract subject to the reserved right of the state to employ its police power and compel a change of rates, and when the state did speak, the municipal power gave way to the sovereign power of the state."

In all of the cases we have cited similar language is used, and in nearly all of them constitutional or statutory provisions conferring the authority on the local authorities of cities to grant or refuse permission to construct and operate street railways in such cities, similar to our own, were construed and passed on, and in all of those cases it is held that those provisions do not foreclose the state from changing the rates of fare agreed upon in the franchise ordinances. We shall refrain from quoting further from the decided cases.

We desire to add, however, that this court, in the case of *Brummitt* v. *Ogden Waterworks Co.,* 33 Utah, 289, 93 Pac. 829, which was decided in 1908 and before practically all of the foregoing cases were decided, and before the Legislature of this state passed a law for the purpose of regulating rates, announced the doctrine laid down in all of the foregoing cases. In the Brummitt Case the constitutional provision in question here was, however, not applicable, and hence was not considered.

Against the foregoing array of authority plaintiffs have cited and rely upon the following cases: *Allegheny* v. *Rail-*

*road,* 159 Pa. 411, 28 Atl. 202; *Appeal of the City of Pitts-burgh,* 115 Pa. 4, 7 Atl. 778; *Plymouth* v. *Railway,* 168 Pa. 181, 32 Atl. 19; *People* v. *New York Ry. Co.,* 217 N. Y. 310, 112 N. E. 49; *Adamson* v. *Nassau El. Ry. Co.,* 89 Hun, 261, 34 N. Y. Supp. 1073; *People* v. *Tonawanda,* 70 Misc. Rep. 91, 126 N. Y. Supp, 186; *Detroit* v. *Detroit, etc., Ry. Co.,* 184 U. S. 368, 22 Sup. Ct. 410, 46 L. Ed. 592; *Public Service Commission* v. *Westchester St. Ry. Co.,* 206 N. Y. 209, 99 N. E. 536; *Gaedeke* v. *Staten Island M. R. Co.,* 43 App. Div. 514, 60 N. Y. Supp. 598; *People* v. *Wilcox,* 133 App. Div. 556, 118 N. Y. Supp. 248, and *Re N. Y. & Northshore Tr. Co.,* P. U. R. 1918A, 893.

Every one of the cases last above cited, however, is clearly distinguishable from the cases we have first above referred to except the last one. That case squarely supports plaintiffs' contention that the franchise ordinances constituted contracts which may not be altered in any material part except by the consent of the parties in interest. That case originated, however, before the Public Service Commission of the state of New York, and therefore merely represents the views of the commission. While no doubt the decision is entitled to respectful consideration, yet it is not authority since it does not emanate from a court of last resort. The case of *In re Hunt-ington Ry. Co.,* P. U. R. 1918A, 249, also originated before the Public Service Commission of the Second district of the state of New York, and is a decision of that commission. That decision is, however, squarely in opposition to the decision from the commission of the First district and is therefore in harmony with the great weight of authority. Many, if not all, of the cases relied on by plaintiffs are also cited and relied on in the opinion of the Public Service Commission of the First district of New York. In many of those cases it is held that franchise ordinances, like those in question in the case at bar, constitute contracts which are binding and enforceable between the parties. The further question was, however, not decided whether such contracts are also binding upon the state in its sovereign capacity. Indeed, in many of the cases it is clearly

enough intimated that if that question had been presented for decision the result might have been different.

We have no difficulty in reconciling the decisions in those cases. It is now settled law that so long as the state does not interfere the rates agreed upon between the cities and the street railway companies in the franchise ordinances are binding and enforceable. Neither party, without the consent of the other, may disregard any rate that is agreed upon between them. Either party may, however, make application to the Utilities Commission, if one is created by Legislative enactment, for the purpose of being relieved from the rates fixed in the franchise ordinance, and if it be made to appear that the rates under existing conditions have become unfair or unreasonable, in that they are either too high or too low, the commission may establish a rate which will again respond to the existing conditions, and may so adjust it as to make it fair, just and reasonable both to the railroad company and to the public. In doing that the constitutional rights of the parties are neither invaded nor disregarded, for the simple reason that when the original rate was fixed by agreement it was still subject to modification at any time by the sovereign power of the state, providing the fare as fixed is found to be unfair and unreasonable. Every contract fixing rates entered into between the cities of this state and street railway companies, both under the Constitution and the statute, is always subject to change by the paramount power of the state, and the right of the state to so change the rates continues unless and until the Legislature has in express terms surrendered the power or delegated it to some other arm of the state.

Plaintiffs' contention, therefore, that the rates of fare fixed by the franchise ordinances should have been affirmed by the commission upon the ground that such rights were contractual cannot prevail, and must be overruled.

Plaintiffs, however, also insist that the commutation tickets are not within the purview of the Utilities Act, but are excluded therefrom by a certain exception found in subdivision "c" of section 5 of article 3 of that act. It is there provided:

"Nothing in this act contained shall be construed   *   *   *
to prevent the carrying out of contracts for free or reduced
rate passenger transportation or other public utility service
heretofore made, founded upon adequate consideration and
lawful when made."

The foregoing provision is found among the exceptions in
favor of employees and respecting agreements with other utili-
ties.   While the language of the exception is not as clear as
it could have been made, yet it is manifest that it was not in-
tended to refer to the rates fixed in franchise ordinances.   In
our opinion the manifest purpose of the Legislature was to
prevent an injustice like that in the case of *Louisville, etc.,
Ry. Co.* v. *Mottley,* 219 U. S. 467, 31 Sup. Ct. 265, 34 L. R.
A. (N. S.) 671, in which case life passes were issued to Mottley
and his wife upon valuable consideration received by the rail-
road company.   In that case the Supreme Court of the United
States held that under the act of Congress of February 4,
1887, c. 104, 24 Stat. 379, as subsequently amended (U. S.
Comp. St. 1916, section 8563 et seq.), common carriers were
prohibited from transporting either freight or passengers ex-
cept at the regular rates, which had to be paid in cash.   Under
that decision, therefore, the Mottleys were prohibited from
riding on their passes, although they had paid for them before
the congressional act had been passed.   Moreover, it sometimes
happens that passes are issued in payment for right of way
and other privileges granted by the owners of land to common
carriers.   Under the Mottley decision, however, all such passes
would be void regardless of the consideration that the owners
had paid to the common carriers.   The Legislature, therefore,
very properly, and, as we think, wisely, excepted such cases
from the operation of the Utilities Act in so far as intrastate
business is concerned.   That is all that was attempted, and all
that was done, by the adoption of the exception aforesaid.
This contention must therefore likewise fail.

It is, however, further contended that, because the franchise
ordinances provided for the so-called commutation tickets and
in reliance on them many persons have built homes in
the suburbs of Salt Lake City and along defendant's        3

line of street railway outside of Salt Lake City, for that reason the defendant should be held to be estopped from increasing the rates of fare without the consent of those persons. It needs no argument to show that the elements of estoppel are lacking in this case. A conclusive answer to the contention, however, is that any one who purchased commutation tickets and who built a home did so subject to the right of the state to change or alter the fares fixed in the franchise ordinances in case it was found that such fares were unfair or unreasonable. Let us assume, however, that the rate fixed in the franchise ordinance passed by Salt Lake City (which it seems, is for the term of fifty years) in the course of ten or fifteen years should become unreasonably high, would those same persons then consent that the defendant might continue to charge and collect a rate for the full period of fifty years, although such rate, by reason of unforeseen conditions, had become grossly unfair and unjust? Moreover, the public, as well as the persons living along the line aforesaid, are directly interested in maintaining an adequate, efficient, and safe service on the part of the defendant. In order to maintain such a service the rates of fare must be sufficient to pay adequate wages to the defendant's employees and sufficient to defray the other incidental costs and expenses necessary to operate the street railway system. When the rates no longer are sufficient to produce adequate revenue to meet the costs of giving an adequate, efficient and safe service and the service for that reason deteriorates, it is the man with limited means, and the wage-earner, neither of whom have the means to provide private transportation, who suffer first. They will be first affected, and will sustain the greatest inconvenience if not loss. While it is true that under such circumstances all will suffer more or less yet the class first named will necessarily suffer most. It is the duty of the state, therefore, to see that the rates continue to be fair and just both to the public and to the street railway company. If plaintiffs' contention, therefore, that the defendant be estopped should prevail, it, in the long run, might result in far greater injury to the persons now insisting upon the estopped than will the increased rate. In no

event, however, can it be held that the state is estopped from regulating the rates whenever it becomes necessary to do that so as to make them reasonable and fair unless the state has surrendered that right as before stated.

From what we have said we do not wish to be understood as either affirming the rate fixed by the commission or disapproving it. For the reasons hereinafter stated it will appear that we do not possess the power to review the commission's findings in respect of whether a certain rate is reasonable or otherwise.

The plaintiffs, however, also contend that the evidence is insufficient to sustain the findings and order of the commission by which the rates were found to be inadequate and were increased, and, further, that the findings are in and of themselves insufficient. Referring to the last objection first, we are of the opinion that, in view of the elaborate opinion of the commission, which was filed with the findings, the findings are sufficient. While it is true that the Utilities Act expressly requires the commission to make findings, and while it is also true that the commission should be careful to make proper findings respecting the material ultimate facts upon which an order is based, yet we cannot see wherein the plaintiffs, or any one else could have been, or can be, benefited if the findings had been far more specific. When the findings and the opinion filed by the commission are considered together, as in this case we think they should be, we are of the opinion that the objection that the findings are insufficient is not tenable, and hence that objection must fail.

It is, however, earnestly insisted that the evidence is insufficient to sustain the finding that the rates fixed by the franchise ordinances are unreasonably low, and are no longer sufficient to enable the defendant to furnish adequate and efficient service to meet the public necessities. Notwithstanding that it was suggested at the hearing that, in view of the limited powers that the Utilities Act has conferred on this court, and that for that reason we are prohibited from passing on the evidence or upon whether the commission should have adopted some other rate, counsel have filed elaborate briefs on the subject. After a careful examination

of the authorities we are more than ever confirmed in the opinion that all that we can review in cases of this kind is whether there is any evidence to sustain the findings of the commission, whether it has exercised its authority according to law, and whether any constitutional rights of the complaining party have been invaded or disregarded. In view that the commission is merely an arm of the Legislature through whom that body acts in matters of this kind, but a moment's reflection convinces any one that this court may not interfere except for the reasons just stated. If interference were extended beyond those limits, it would, in effect, be an interference by this court with the lawmaking power of this state. It requires no argument to show why that may not be done. We have no more right to interfere with the duties and powers of the Legislature than that body has to interfere with the powers and duties imposed upon us as a court. True, the Legislature could perhaps have given us somewhat greater powers to pass upon the findings and orders of the commission. Such has been done in some other jurisdictions. The Legislature of this state has, however, not seen fit to clothe this court with greater powers of review, and we have neither the inclination nor the right to exercise a power which is neither inherent nor properly conferred. It is also true, as plaintiff's counsel suggest, that the Constitution of this state provides that the courts shall always be open, and that:

"Every parson, for an injury done to him or in his person, property or reputation, shall have remedy by due course of law which shall be administered without denial or unnecessary delay." Article 1, section 11.

That provision, however, applies only to judicial questions. It is not meant thereby that this court may reach out and usurp powers which belong to another independent and co-ordinate branch of the state government. The power conferred upon the Legislature is supreme respecting the regulation and establishing of rates. We may not interfere with or review any legislative act unless some judicial question is presented for review. Unless a rate established by the com-

mission is clearly oppressive on the one hand or confiscatory on the other, no judicial question is presented. So far, therefore, as the questions are judicial the Utilities Act has conferred power upon this court, and in so far as the acts of the commission are properly administrative, or in their nature legislative, the power has been wisely and properly withheld from us. Whether there is any substantial evidence to support any finding of fact that the commission may make is a judicial question, and may be determined by this court. A mere cursory reading of the record, however, discloses that there is at least some substantial evidence in support of every essential fact found by the commission. While it is true that in this case plaintiffs contend that the rates as fixed by the franchise ordinances provide sufficient revenue· to enable the defendant to provide an economical, adequate, and safe service, and to yield a fair return on its investments, yet it is equally true that the defendant insists to the contrary, and the commission has so found. The evidence in support of both contentions was submitted to, considered by,· and passed on by the commission, and, as the act provides, its findings are conclusive upon us. The record, however, discloses that the defendant always has obtained an income over and above the cost of operation and maintenance of its railway system. The only matter, therefore, that now divides the parties is, that owing to the increased cost of labor and material, the present rates no longer yield to defendant a reasonable net return on its investments. The parties also differ with respect to the amount invested and what would amount to a reasonable return on the investments. The commission has, however, fully considered and passed on those questions. Since we are powerless to review the findings of the commission, in that respect, it is of no consequence what conclusion the writer, or, for that matter, this court, might arrive at upon those questions. It may, however, not be improper to suggest that, while the commission in establishing and fixing rates is invested with great powers,·it also assumes great responsibilities. It is therefore of the utmost importance that the commission should proceed with great care in changing rates.

While caution in that regard should always be exercised, yet, at this time, when the whole world is engaged in a most destructive war and every condition is grossly abnormal, to do so is of special importance.  While, generally speaking, every utility that serves the public must be allowed a fair and reasonable return on its investments over and above the actual cost and expense of providing adequate, efficient, and safe service when economically managed, yet it is not true that such a return must be assured to every utility when, as now, the conditions are grossly abnormal on account of the war and while such conditions are necessarily temporary.    At such a time and under such conditions every individual and every enterprise must bear his or its share of the burden incident to the great conflict, and while rates should be made adequate to permit every public utility to pay a reasonable wage to its employees and to provide adequate, safe, and efficient service, yet rates should not be so high as to become oppressive, and they should be so regulated as to be fair both to the utility and to the public.   A careful reading of the opinion filed by the commission has, however, convinced us that in allowing the moderate increase in the present instance the commission has kept in mind the foregoing propositions.   If the commission has not done so to the full extent herein outlined, yet it has not entirely overlooked the propositions.

After the foregoing was written counsel for defendant called our attention to the case of *In the Matter of the Application of Quinby et al.*, 223 N. Y. 244, 119 N. E. 433.   That case was decided on the 5th day of April, 1918, by the New York Court of Appeals.   The decision is by a divided court, the Chief Justice and another justice dissenting, while another justice concurs specially.   The decision is, however, based upon the narrow ground that in the opinion of the majority the New York Utilities Act (Consol. Laws, c. 48) has not conferred the power upon the Public Service Commission of New York to raise the rates that were agreed to between cities and street railway corporations.   That decision, therefore, can have but little, if any effect upon what the decision should be in this case.   At all events it can have no controlling influence.   In-

deed, in view that every proposition that we contend for herein, except the one stated, is expressly approved in the majority opinion, the decision is really in harmony with all that we have decided. We here call attention to the decision, however, for the express purpose of avoiding any misunderstanding respecting the two cases of *In re Huntington Ry. Co.*, P. U. R. 1918A, 249, and *In re New York & Northshore Tr. Co.*, P. U. R. 1918A, 893, the first one being cited in this opinion by us in support of our views and the second one also being referred to herein in support of plaintiff's contentions. While the decision in *Re Huntington Ry Co.* is overruled upon the ground stated, yet none of the propositions decided in *Re New York & Northshore Tr. Co.* are sustained. Upon the contrary, every proposition decided in that case is tacitly at least overruled. The late New York case is therefore an authority on the main propositions decided here. We make this statement for the reason that in our Utilities Act the very ground on which the New York decision is based is obviated, as will appear from an examination of the powers that are conferred by that act upon the commission, a part of which we have quoted herein.

In concluding this opinion we desire to express our appreciation to counsel for both sides for the able and helpful briefs and arguments presented by them. We also desire to extend our thanks to counsel for defendant for having called our attention to the late New York case. We especially appreciate an act of that kind, since this court has but one purpose, and that is to decide every case in accordance with the declared law upon the questions presented for decision.

For the reasons stated, the findings and order of the commission are affirmed at plaintiff's costs.

McCARTY, CORFMAN, THURMAN, and GIDEON, JJ., concur.