[Civ. No. 3940. Third Appellate District.—October 25, 1929.]

BENT BROTHERS, INC. (a Corporation), Petitioner, v. J. P. CAMPBELL, as City Auditor, etc., Respondent.

Hill, Morgan & Bledsoe and Kenneth K. Wright for Petitioner.

J. LeRoy Johnson and Tom B. Quinn for Respondent.

PLUMMER, J.—This is an original proceeding instituted by the petitioner herein praying that a writ of mandate be directed to the respondent as auditor of the city of Stockton, to draw a warrant in favor of the petitioner against the city of Stockton for the payment of $70,724.27 alleged to be due the petitioner by virtue of a contract entered into between the petitioner and the city of Stockton for the construction of a flood control dam at a point in the Calaveras River, in the county of Calaveras, east of the city of Stockton. After a few preliminary allegations which we need not mention, the petitioner sets forth that on the seventeenth day of June, 1924, the electors of the city of Stockton, by their affirmative votes, approved an issuance of bonds in the sum of $1,500,000 to construct a flood control dam in the Calaveras River, in the county of Calaveras, at a place on said river designated in the proposal submitted to the electors at the bond election just referred to. Thereafter, and on or about the fourteenth day of July, 1924, the city council of the city of Stockton, by ordinance duly adopted, provided for the issuance of bonds to construct the flood control dam, as authorized by the electors of said city; that thereafter the bonds authorized to be issued were issued and sold and the city of Stockton now has the money with which to meet the demand of the petitioner first herein mentioned; that pursuant to direction of the city council, the city engineer of the city of Stockton, prepared plans for the erection of a flood control dam in the Calaveras River, and thereafter submitted them

to the state engineer and by him were approved; that after the approval of said plans and specifications by the state engineer, and on the thirteenth day of May, 1929, the plans and specifications for the erection of the proposed flood control dam in the Calaveras River were submitted to the city council of the city of Stockton, and approved and adopted by the city council as the plans and specifications for the erection of said dam and making the improvements mentioned in the plans and specifications; that after these proceedings had been taken and had, and on the fourth day of June, 1929, the city council of the city of Stockton adopted its resolution authorizing the city clerk of the city of Stockton to advertise for sealed proposals for the furnishing of materials and performing the work in the construction of the flood control dam herein mentioned, in accordance with the plans and specifications adopted therefor; that after being so authorized, the city clerk regularly advertised for bids, and at the time appointed therefor, to wit, on the tenth day of June, 1929, the city council publicly opened and examined all the sealed proposals for the building of said flood control dam, and after examining said bids the city council of the city of Stockton, by resolution, approved the bid of the petitioner, and the petitioner was awarded the contract for the construction of the proposed dam and the performance of all work connected therewith provided for in the plans and specifications; that thereafter, and on the twenty-fifth day of June, 1929, the city of Stockton entered into a contract with the petitioner for the doing of said work, and the furnishing of materials, and the petitioner, within the time limit specified, proceeded to begin and carry on the work under its said contract with the city of Stockton, in pursuance of the plans and specifications adopted therefor; that thereafter, and after work to the value of several thousand dollars had been performed under the petitioner's contract, and on the sixteenth day of September, 1929, the state engineer of the state of California, acting under the provisions of an act of the legislature approved June 10, 1929 (Stats. 1929, p. 1505), having inspected the work and the plans and specifications therefor as adopted by the city of Stockton for the building of said flood control dam, did demand of the city of Stockton that certain modifications be made

in said plans for the construction of said dam, and that certain changes be made in the work already done; that the change in the plans and specifications adopted by the city of Stockton, as made by the state engineer, involved decreasing the radius of the arch section and varying the radii for the horizontal arch sections in length from the base to the crest of the dam. The height, capacity, general location and general type of the dam were not changed. The location of the central portion of the arch was moved up-stream about fifty feet, and the left abutment down-stream approximately the same distance. No considerable lateral displacement was made in the central mass of the dam. The quantity of foundation excavation required was about the same as specified in the original plans. The quantity of concrete required to make the necessary changes was increased about ten per cent above that estimated under the original plans. No material modification of the gravity section abutments are involved in the proposed changes. No change is made in spillway, outlet or flood control works, nor in the specifications regarding construction. That in pursuance of the demand of the state engineer, the city of Stockton caused to be prepared certain modifications of the original plans for the work involved, and on the sixteenth day of September, 1929, the modifications of the plan for the doing of said work were duly and regularly presented to and adopted by the city council of the city of Stockton; that as modified and adopted by the city of Stockton the plans and specifications were thereafter approved by the state engineer; that since the modification of the plans made for the construction of said flood control dam as demanded by the state engineer, the petitioner has proceeded with the work of constructing said dam according to the modified plans, and has performed work entitling him to payment at the present time in the sum of $70,724.27, all of which appears by the certificate of the city engineer of the city of Stockton in his estimate and value of the work and the amount to which the petitioner is entitled, submitted to the city council of the city of Stockton; that the certificate of the city engineer was regularly approved by the city manager of the city of Stockton, and the claim of the petitioner is justly due and payable; that said claim of the petitioner was presented

to the city auditor of the city of Stockton on or about the first day of October, 1929; that the city auditor, the respondent herein, refused to draw a warrant against the city treasury of the city of Stockton for the payment of the work performed by the plaintiff, as certified by the city engineer and approved by the city manager of the city of Stockton, on the ground that the plans for the construction of the flood control dam hereinbefore referred to had been changed to such an extent that it voided the contract under which the petitioner was seeking compensation.

This brings us to a consideration of the act of the legislature approved June 10, 1929, relating to the supervision of dams. The first suggestion which we will consider is the unconstitutionality of the act in that it is in violation of the constitutional provisions of this state and of the United States relative to the impairment of contracts; and, also, that it confers upon the state engineer arbitrary powers enabling him to adopt rules and regulations which, if violated, subjects the violator to a penalty of $2,000, or imprisonment in a county jail not exceeding six months, or both. While the act referred to does not, by its terms, define of what material any dam shall be constructed, whether of concrete, whether a rock-filled dam, or whether partly of concrete and earth filling, or of rock filling, it does provide for the inspection of any proposed dam and the making and proposing of amendments to any plans or specifications for the erection of a dam. As we read the act there is nothing which authorizes the state engineer to directly require the construction of a dam according to any particular plans or specifications, nor does the act authorize the state engineer to make any material alterations in any contract which has been entered into between an owner and contractor for the construction of a dam. But while the act does not, in terms, directly authorize the state engineer to do what we have mentioned, it does indirectly give him power to enforce his recommendations and suggestions by enabling him to begin actions to enjoin and restrain the construction or maintenance of any dam not constructed or repaired according to approved plans and specifications, and through the medium of the court affect the safety of persons and property living below the point or place of the construction of the dam, and the creating of a reservoir which might

become a menace to the property and lives of persons in the course which the impounded waters would take in the event the proposed structure proved inadequate to withstand the pressure of the impounded waters. We do not need to pass upon the question as to the validity of section 17 of the act referred to for the simple reason that if it should be considered void under the reasoning of the case of *Schaezlein* v. *Cabaniss*, 135 Cal. 466, 469 [87 Am. St. Rep. 122, 56 L. R. A. 733, 67 Pac. 755], no other portions of the act are thereby affected. Section 18 of the act authorizing the state engineer to institute actions by way of *mandamus* or injunction puts teeth enough therein to make all the reasonable mandates of the state engineer effective. ■ While not so denominated, the act is purely a police regulation and must stand or fall as so considered.

A brief definition and statement will show the validity of the act as a police regulation and proper exercise of the sovereign power of the state. In 12 C. J., page 904, we find the following applicable definitions: "The police power is the power inherent in a government to enact laws within constitutional limits to promote the order, safety, health, morals and general welfare of society. As applied to the powers of the states of the American Union the term is also used to denote those inherent governmental powers which under the federal system established by the Constitution of the United States are reserved to the several states." The police power of the state differs materially from the powers of eminent domain. ■ In eminent domain one's property can be taken for public use only upon just compensation. Under the police powers it may not simply be taken, but destroyed without any compensation, depending upon the statutes of the state. Again: "The police power is an attribute of sovereignty, and exists without any reservation in the Constitution, being founded upon the duty of the state to protect its citizens and provide for the safety and good order of society. It corresponds to the right of self-preservation in the individual, and is an essential element in orderly government. . . . It has for its object the improvement of social and economic conditions affecting the community at large, and collectively, with the view of bringing about the greatest good to the greatest number. On it depends the security of society,

order, the life and health of the citizen, the comfort of existence, the enjoyment of private life and beneficial use of property.'' ■ That the police power of the state to supervise and regulate the construction and maintenance of dams impounding large bodies of water remained un-exercised until the disastrous consequences following the breaking of the St. Francis dam in the southern part of the state, is no argument against its existence, but the experiences attending the breaking of that dam emphasize the necessity for, and the constitutionality of the police powers being extended to, and including such structures in order that the safety of persons and property may be conserved. ■ With these statements as a premise, we think the conclusion clearly follows that the act of the legislature approved June 10, 1929, is constitutional in all its essential provisions, as not only a proper, but as a neces-sary exercise of the police powers of the state. A limited number of authorities only need be cited. In *Union Dry Goods Co.* v. *Georgia Public Service Corp.,* 248 U. S. 372 [9 A. L. R. 1420, 63 L. Ed. 309, 39 Sup. Ct. Rep. 117, 118, see, also, Rose's U. S. Notes Supp.], we find the fol-lowing in relation to the exercise of the police powers of the state, and also of private rights when they come in conflict. It is there said: ''That private contract rights must yield to the public welfare where the latter is appro-priately declared and defined and the two conflict, has been often decided by this court.'' (Citing *Manigault* v. *Springs,* 199 U. S. 473 [50 L. Ed. 274, 26 Sup. Ct. Rep. 127, see, also, Rose's U. S. Notes].) And further: ''It is the settled law of this court that the interdiction of statutes impairing the obligation of contracts does not prevent the state from exercising its police powers for the general good of the public through contracts previously entered into between individuals may thereby be affected.'' (Citing a number of authorities.) The opinion in the case from which we are quoting further sets forth the law that ''contracts must be understood as made in reference to the possible exercise of the rightful authority of the government, and no obli-gation of a contract can extend to the defeat of a legiti-mate government authority.'' (Citing authorities.) Again: ''There is no absolute freedom to do as one wills, or to contract as one chooses. The guaranty of liberty does not

withdraw from legislative supervision that wide department of activity which consists of the making of contracts, or deny to government the power to provide restrictive safeguards. Liberty implies an absence of arbitrary restraint, not immunity from reasonable regulations and prohibitions imposed in the interests of the community. . . . It is settled that neither the 'contract' clause nor the 'due process' clause has the effect of overriding the power of the state to establish all regulations that are reasonably necessary to secure the health, safety, good order, comfort or general welfare of the community; that this power can neither be abdicated nor bargained away, and is inalienable even by express grant; and that all contract and property rights are held subject to its fair exercise.'' In the notes appended to the case of *Salt Lake City* v. *Utah Light & Traction Co.*, 52 Utah, 210 [173 Pac. 556], as reported in 3 A. L. R. 715, are quoted so many cases as to prevent any review of them in this opinion, setting forth the extent to which the police powers of the state may be applied, and the manner in which private rights must yield thereto, establishing abundant authority for the support of the act of the legislature now being considered. Many of the cases referred to in the notes mentioned have to do with the regulation of rates and charges by public service corporations where contracts had been made giving certain consumers or patrons special rates. In practically all of the cases the contracts were held subject to the police powers of the state as exercised through public service corporations. While differing in the circumstances presented, the principle is the same. The conclusion, therefore, follows that while the act under consideration does not authorize the state engineer to make a material alteration in the plans and specifications for the construction and maintenance or repair of any structure coming within the purview of the language used in section 2 of the act approved June 10, 1929, defining dams, it does authorize the state engineer to prevent by injunction, suits or other appropriate court procedure, the erection or maintenance of any structure impounding waters in such a manner as to create a menace to the safety of persons and property living and being along the course where such impounded waters would flow if suddenly discharged. In other words, while under

the constitutional provisions we may admit that the state engineer cannot impair the obligations of contracts, he can maintain suits to prevent contracts from being so executed and performed as to create a menace to life and property.

With these preliminary statements we will next consider certain provisions of the plans and specifications adopted by the city of Stockton for the building of the Calaveras flood control dam, and will consider them in the light of the problems presented, and the right of the state to exercise its police powers over the proposed structure. In the very beginning of this branch of the case it may be well to state that the plans and specifications, proposals and contract called for bids upon, and provide for payment on the basis of unit prices. For example, so many cubic yards of concrete at a certain price per cubic yard. We may also further state that the plans and specifications, proposals and contract all contain language showing that the quantity of material to be used is only estimated, that is, it is estimated at so many cubic yards, whether in excavating or in building. This makes applicable subdivisions 29 and 30 of the plans and specifications. Subdivision 29, in part, reads as follows: "The city of Stockton, by and through its City Council, shall have the right to make such alterations, eliminations and additions as it may elect in the line, grade or dimension of the work herein contemplated or any part thereof, either before or after the commencement of construction. The details and working plans for such alterations, eliminations and additions shall be drawn by or prepared by the City Engineer of the City of Stockton subject to the direction of said City Council. . . . If such changes increase or decrease the amount of work, such increased or decreased quantity of work shall be paid for according to the quantities actually involved and at the unit prices established for such work under this contract." Subdivision 30, relative to extra work, reads: "Extra work or material shall be charged for at actual necessary cost, as determined by the engineer, plus ten per cent for profit, superintendence and general expenses." Under the premises which we have laid down, we think it cannot be gainsaid that the city of Stockton was presented with an exigency or emergency necessitating the amendment or

change of the plans and specifications theretofore adopted for the construction of the Calaveras dam so as to make it conform with the recommendations of the state engineer. The city council could either make the necessary changes and additions so as to safeguard the work and provide against all future contingencies in likewise safeguarding the lives and property below the proposed structure as recommended by the state engineer, or subject itself to an injunction suit to restrain its further proceeding with the proposed construction. Under these conditions the city council amended its plans to conform with the state engineer's suggestions providing additional safeguards. In so doing did the city council run counter to the provisions of section 1 of article 23 of the charter of the city of Stockton, in that said section specifies that no contract for work shall be let where the expenditure exceeds the sum of $1500, except to the lowest bidder, after advertisement for sealed proposals? The answer to this question is found in the unit price method adopted for measuring the cost of the work prior to calling for sealed proposals or bids in the first instance. While the extent of the work is indicated by the plans and specifications, and the amount of material to be used in the construction of the proposed dam is set forth, and the excavations to be made described, they are all in the nature of estimates. In other words, the extent of the excavations to be made and the quantity of material to be used are approximated only. The kind of material to be used is particularly described. The plans and specifications were sufficient to notify all patrons of the kind and character of the work to be done with an appropriation of the amount and extent thereof, and bids were called for on a unit price basis so that each contractor had the same opportunity to bid, and the interest of the taxpayer, in having the work performed for the least possible expenditure of money, properly guarded. The estimated cost of the work in this instance was over $800,000. The quantity of material runs up into several hundred thousand barrels. The circumstances surrounding the work and the character of the work itself precluded the possibility of fixing an exact price for the completed project. Where the unit price is fixed for measuring the value of the work done, every safeguard of the taxpayer is provided, as contemplated by the electors

of the city of Stockton when adopting a charter containing the provisions found in section 1 of article 23 relative to the calling for bids. It is scarcely within the domain of reason to conclude that where a unit price basis is adopted for measuring the value of the work estimated to be done, that if the city council, in the carrying forward of the work costing over $800,000, should find it advisable to make an addition or amendment to, or change in some immaterial portion of the work in order to render it more secure and the cost of so doing would aggregate the sum of $1501, that the work of letting a contract would all have to be done over again.

In 44 C. J., page 379, we find the following: ''Frequently, a municipal improvement contract is so worded and construed as to provide for the payment, not of a lump sum, but rather of a sum to be determined by applying specified unit prices to actual measurement of the work done. Also, provision is sometimes made for an estimate certificate or determination by the City Engineer or other designated officer or Board, of the amount and quantity of work done or materials furnished, or for a determination by him of all questions involving the amount earned under the contract, and for the payment each month, or at other stated periods, of a certain percentage of the estimate, and under such a provision the decision, estimate or certificate of the engineer or other designated officer or board is ordinarily binding and conclusive, provided it is not made fraudulently or in bad faith. . . . Where the certificate provided for has been given, the contractor is entitled to payment according to its terms.'' This statement of the rule exactly fits the conditions of the cause now before us and applies to the contract under which the petitioner has been, and now is performing work. No supplemental contract has been entered into in this case. If the additional work recommended by the state engineer and agreed to by the city council had necessitated the entering into or execution of a supplemental contract between the petitioner and the city council, then section 1 of article 23 of the charter of the city of Stockton would have applied, unless covered by the provisions of the contract. Thus, in 44 C. J., page 101, the law as to the statutes or charter provisions is thus stated: ''Such statutes apply equally to supplemental contracts covering

items not provided for by the terms of the original contract, unless bids for the original contract were made on the basis of contemplated extensions of the work under supplemental contracts to be made with the successful bidder without further bidding, and such statutes also apply to amendments of a contract already executed in compliance with the law, where such amendments alter the original contract in some vital and essential particular, notwithstanding a clause in the original contract reserves to the city the right to modify any of its essential terms by subsequent supplemental contracts to be made by its officers without due advertisement and competitive bidding." In the same volume, on page 297, the rule as to change of plans is thus worded: "A slight change in the character of the improvement as determined upon by the petitioners or by the municipal authorities, can be made at any time during the proceedings and prior to the execution of the improvement plan, but a substantial alteration, such as one which materially increases the cost of the improvement, amounts to an abandonment of the contract and cannot be made without the institution of new proceedings." Again, on page 373, we find the following: "Generally speaking, a municipal improvement contract may be changed or modified by the municipality, with the consent of the other contracting party, and without consulting abutting owners, but cannot be rewritten by the court or by one party alone." The foregoing statements of the law, save and except where otherwise stated herein, refer to contracts where the compensation is fixed at a lump sum, and under such circumstances we find that immaterial changes or modifications which do not substantially affect the character of the work or unreasonably increase the cost thereof, are permissible.

In the case of *Frazer et al.* v. *City of Ardmore*, 103 Okl. 31 [229 Pac. 143], we have a case on all-fours with the one at bar. There, the contract was based upon a unit price of the work to be performed in determining the compensation that would be earned by the contractor. The estimated cost of the work, as set forth in the contract, was $19,915.92, but measured by the unit price method adopted for determining the cost and the money to which the contractor was entitled, it was found, upon completion of the work, to amount to the sum of $23,730.14. The right of the

contractor to receive such payment was contested. The Supreme Court of Oklahoma upheld the contract and sustained the judgment of the trial court in awarding to the contractor the value of the work as measured by the unit price. We may here add that the compensation to which the contractor is found to be entitled exceeded the estimate in the contract by more than ten per cent, which goes beyond the value of the extra work recommended in this case by the state engineer. That a clause in the contract authorizing the city to direct the performance of extra work, does not invalidate the instrument, is held in the case of *City Street Improvement Co.* v. *Kroh,* 158 Cal. 308 [110 Pac. 933]. In the Kroh case the contract involved was for a lump sum and was not let upon a unit price basis, and while providing for extra work, did not obviate the provisions of the law relative to advertising and letting of bids for work exceeding the limit of expenditures allowed without bids.

To review all the authorities bearing upon the questions here involved would extend this opinion to an undue length. Therefore, we will confine our citation of authorities to a limited number, which support the following statements of the law: That where unseen emergencies arise after the letting of a contract and the beginning of work, further publication and letting of bids are not required: *Board of Commissioners* v. *Gibson,* 158 Ind. 471 [63 N. E. 982]; *City of Chicago* v. *McKechney,* 91 Ill. App. 442; *City of Ida Grove* v. *Ida Grove Armory Co.,* 146 Iowa, 690 [125 N. W. 866]; *Meyers et al.* v. *Wood,* 173 Mo. App. 564 [158 S. W. 909]; *Alsmeier* v. *Adams,* 62 Ind. App. 219 [105 N. E. 1033, 109 N. E. 58]. Various illustrations are given in the cases just cited as to the changes in the plans necessitated by emergencies arising after the beginning of the work, and all of the cases hold that such changes do not invalidate the contract. A distinction, however, is made in all of the cases, between amendments or alterations in the plans and specifications which do not affect the material character of the work and those admitted changes or alterations which constitute substantial modifications or changes in the character and quality of the work to be performed. Where changes are only incidental, the contract is held unaffected; otherwise a different conclusion is reached. In the case at

bar nothing has been called to our attention which would indicate any substantial change, either in the character of the work to be done, or, in view of the extent of the work to be done, any really substantial addition thereto. As we have shown, the added work does not reach the percentage degree approved in the case of *Frazer et al.* v. *City of Ardmore, supra.*

Finally, it must be assumed that the city of Stockton, in adopting plans and specifications, and the contractor in entering into the contract, did so with the knowledge of the law applicable, and the character of the work to be performed, just as indicated by section 1656 of the Civil Code. This included a knowledge and consideration of the possible exercise of the police powers of the state in safeguarding the lives and property of all those persons living along the line that would be submerged by the sudden release of the impounded waters.

We think the prayer of the petitioner should be granted, and it is hereby ordered that a writ of mandate issue from this court directing J. P. Campbell, as the city auditor of the city of Stockton, to draw a warrant in favor of the petitioner for the sum of $70,724.27, payable out of the funds provided for the erection of the Calaveras flood control dam. Demurrer overruled.

Thompson (R. L.), J., and Finch, P. J., concurred.